822 A.2d 1212

AMERICAN GENERAL ASSURANCE COMPANY, et al.

v.

Martha K. PAPPANO.

No. 97, Sept. Term, 2002.

Court of Appeals of Maryland.

May 6, 2003.

340

Christopher C. Fogleman (Patricia L. Morse, Rockville, on brief), Sean H. Brogan (Stephen C. Baker, Philadelphia, PA, Scott A. Thomas, Baltimore, on brief), for petitioners.

Stephen H. Ring (Stephen H. Ring, P.C., Gaithersburg, on brief), for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, J.

Maryland Code, § 5–101 of the Courts and Judicial Proceedings Article contains the State's general statute of limitations. It requires that a civil action be filed within three years after the date it accrues, unless a different period of time is prescribed by some other statute. The issue before us is whether the Circuit Court for Montgomery County erred in entering a summary judgment that Martha Pappano's action against petitioners was barred by that statute. The Court of Special Appeals concluded that the trial court did err and therefore reversed the judgments. *Pappano v. Chevy Chase Bank,* 145 Md.App. 670, 806 A.2d 334 (2002). We agree in part and disagree in part with the intermediate appellate court.

## BACKGROUND

Ms. Pappano's action arises from the failure of Chevy Chase Bank F.S.B. and Chevy Chase Financial Services Corporation (collectively, Chevy Chase) to provide credit life insurance on her husband's life in connection with a home equity loan that the Pappanos jointly obtained in 1990 and increased in 1994. She sued Chevy Chase for negligence, breach of contract, and various other wrongs, and she also sued a number of insurance companies for vicarious liability, on the theory that Chevy Chase had acted as their agent and that they were therefore responsible for its wrongful conduct.

In September, 1990, Mr. and Ms. Pappano applied to Chevy Chase for a $75,000 home equity loan. They both signed the application and on it they checked a box next to the statement "I (we) would like Credit Life Insurance." That statement was followed by another that said that credit life insurance was optional, that the premium would vary based on the

amount of the loan, and that the premium would be included in the monthly payments.

The question of credit life insurance arose again at closing on the loan, which occurred on October 9, 1990. In an affidavit submitted in response to the motions for summary judgment, Ms. Pappano said that she and her husband made inquiry of the settlement officer, who explained that the insurance would pay the outstanding balance of the loan in the event of death and that it would be most beneficial if it covered the spouse with the higher income. Ms. Pappano was retired on disability, with an annual disability income of less than $20,000; her husband was employed and earned $37,000. They decided, she said, to have the insurance on both lives, with the understanding that, if either one died, the full insurance limit would be applied to the outstanding balance of the loan. Accordingly, through appropriate checks and circles in boxes on the settlement sheet, they indicated that "we," rather than "I," desired credit life insurance and that the insurance was to be "joint" as opposed to "single." The rate quoted for single insurance was $.83 per $1,000; the rate for joint insurance was $1.38 per $1,000. Ms. Pappano stated that they did not receive a copy of the settlement sheet and that they were never given any documents regarding the credit life insurance, either before or after closing.

At the time, Chevy Chase had in force a group policy issued by Security of America Life Insurance Company, under which Chevy Chase was authorized to offer to its eligible customers credit life insurance in a maximum amount not to exceed the lesser of the amount of the loan or $50,000. The agreement called for Security of America to furnish certificates of insurance to Chevy Chase which Chevy Chase was obliged to issue to the customers within 30 days after the effective date of the insurance. Chevy Chase was responsible for taking the application from the customer and forwarding it to Security of America. Upon satisfactory proof of death of an insured customer, the insurer agreed to pay the amount of insurance in force to Chevy Chase, in reduction of the outstanding loan. There was apparently no direct contact between Security of

America and the insured customer. The premiums stated in the group policy were $.8265 for single life and $1.3775 for joint life—somewhat less than the rates noted on the Chevy Chase application form.

Pursuant to that group policy and agreement, a policy was issued, but it was a single policy covering only Ms. Pappano and not her husband. The policy was dated October 9, 1990 and was in the amount of $50,000. Notwithstanding Chevy Chase's obligation to forward the policy to Ms. Pappano, she averred in her affidavit that she never received either the policy or any other documents regarding credit life insurance.

Effective July 15, 1994, Chevy Chase terminated the group policy with Security of America. From and after that date, it offered its loan customers credit life insurance through Union Security Life Insurance Company. The agreement it had with that company is not in the record before us, and we therefore do not know whether, or to what extent, it differed from the agreement with Security of America.

In 1994, the Pappanos decided to increase the loan. The application for increase is not in the record extract. On the settlement sheet, signed in connection with the July 18, 1994 closing, the Pappanos checked the box stating that "I/we desire credit life insurance" but did not circle the "we" or check either "single" or "joint," as they had done before. Ms. Pappano stated that they again discussed the matter with the settlement officer, who recommended insurance on Mr. Pappano's life alone, because of the cheaper cost, but that they decided to continue the joint coverage. They did not made a selection on the form between "joint" and "single" because, unlike the 1990 form, this one did not state the premiums for the insurance and they decided not to check any blank lines. Ms. Pappano stated that, as was the case with the 1990 loan, they never received a copy of the settlement sheet or any documents regarding the credit life insurance.

During the life of the loan, the Pappanos received monthly statements that showed amounts for insurance, but the statements did not indicate either the amount of the insurance or

whose life it insured.  The amounts varied from month to month, presumably based on the outstanding balance of the loan, but they do not seem to match any of the rates stated on the 1990 settlement sheet or in the group policy issued by Security of America.  Because we are not privy to the subsequent agreement between Chevy Chase and Union Security and because the settlement sheet applicable to the 1994 loan does not disclose the premiums, there is no way to tell, on this record, whether the premiums included in the monthly installments are consistent with a joint life or single life policy.

Mr. Pappano died on August 19, 1996.  Until sometime in the Spring of 1997, however, Ms. Pappano did nothing to investigate the matter of the insurance she believed existed on his life—insurance that would have either paid or reduced the balance of the loan.[1]  She claimed that her inattention to the matter was the result of various personal and family crises—grief over the loss of her husband, having to handle household finances for the first time, disputes over other insurance benefits, and surgery that she underwent in January, 1997. Sometime in the Spring of 1997—the date, and even the month, being uncertain—Ms.  Pappano inquired of the manager of a Chevy Chase branch bank whether there was insurance that applied to the loan, and he responded that there was none.  Although admittedly naive, she said that she "still had a sense that something was not right."  She there-fore "repeated this inquiry at the bank a few more times, hoping there had been some mistake, asking different managers," and "[e]ach time I was told that there was no insurance."

In 1999, facing serious financial difficulties, she decided to sell her home.  In connection with that sale, she received a letter from Chevy Chase dated July 21, 1999, addressed to

---

[1].  One of the several uncertainties in this case is how much insurance was actually available or provided.  Ms. Pappano's affidavit testimony indicates that the insurance was to be sufficient to pay the balance of the loan.  The Security of America arrangement limited the insurance to $50,000.  As noted, we do not know whether that limit (or any other beyond the outstanding loan balance) was part of the arrangement with Union Security.

*Mr.* Pappano, showing an outstanding principal balance of $123,426, plus a $1,720 finance charge, $54.47 for "Insurance (Credit Life)," and a $15 release preparation fee, for a total payoff balance of $125,216. That letter, she said, marked the first time she saw the term "credit life" in connection with any documents from Chevy Chase since the 1994 settlement. With that revelation, on August 2, 1999, she called the death benefits department at Chevy Chase and again inquired about "whether there was any insurance that applied to the loan." She was told, first, that there *was* such insurance on Mr. Pappano's life, but about 45 minutes later, the bank called back, apologized, and informed her that the insurance was on her life alone and not on her husband's, and that, as a result, no benefits were payable. On August 10, 1999, the home was sold and, from the proceeds, the loan was paid.

In her brief in this Court, Ms. Pappano states that she "first learned of the existence of Security of America Life Insurance Company through [Chevy Chase's] pre-suit production of documents following her inquiry in August, 1999." She does not indicate what information she had about Security, although there is some indication that she was then supplied with the group policy and the individual policy in her name.

On December 17, 1999, Ms. Pappano filed suit against Chevy Chase for negligence, negligent misrepresentation, promissory estoppel, unjust enrichment, breach of contract, civil conspiracy, and breach of fiduciary duty. Alleging some of the facts recounted above, she complained that Chevy Chase had failed to place the insurance on the life of her husband, as promised, and had failed, as well, to notify them that the insurance had not been so placed. With respect to the negligence actions, she averred that, by undertaking to advise the Pappanos regarding credit life insurance, Chevy Chase had assumed the fiduciary duties of an insurance and financial advisor and had failed to exercise ordinary care. She also complained that Chevy Chase had failed to produce the credit life insurance applications and related documents, claiming that it was unable to locate those documents. Chevy

Chase answered the complaint and raised, among other defenses, that the actions were barred by limitations.

Although aware of the existence of Security of America, Ms. Pappano did not initially join that company as a defendant. She did, however, continue to seek documents from Chevy Chase regarding the application for and placement of credit life insurance. Her concern, in those requests, seemed to focus on the relevance of the documents to her claims against Chevy Chase or to various defenses that Chevy Chase might raise, rather than any search for additional defendants.[2] On May 15, 2000, the court ordered Chevy Chase to produce those documents. What was produced, and when, is not clear from the record.

On September 5, 2000, Ms. Pappano filed an amended complaint that added six insurance companies as defendants— American General Assurance Company, American General Indemnity Company, Security of America Life Insurance Company, United States Life Insurance Company, USLIFE Indemnity Company, and USLIFE Credit Life Insurance

---

2. In a memorandum filed in support of her motion to compel the production of documents, Ms. Pappano said that the documents were relevant to her claim that Chevy Chase was negligent in the processing and handling of the insurance placement process and to the issue of whether there was any misrepresentation of material facts in the application that may have justified a denial of coverage. She warned that if the documents that she sought pertaining to the application, sale, or placement of credit life insurance on her life or that of her husband were not produced, she would seek an order that would establish the following facts: that there was no misrepresentation of any material fact by the Pappanos in any application for insurance submitted by them; that no notice of acceptance or declination of coverage was sent to them prior to Mr. Pappano's death; that Chevy Chase had undertaken the responsibility of placing insurance on both lives at the 1990 and 1994 closings; and that the Pappanos were led to believe and reasonably believed that Chevy Chase had taken all steps necessary to place the requested insurance on both lives and to believe that such insurance was in place at the time of Mr. Pappano's death. Nothing was said in the memorandum about the need to identify additional defendants. The closest she came to that concerned her quest for documents pertaining to any financial incentive for Chevy Chase related to the placement of credit life insurance, which she claimed were relevant to her claim that Chevy Chase was both an insurer and an insurance agent and had special duties of care as such.

Company. She claimed that Security of America was the company that was supposed to provide the insurance on Mr. Pappano's life and that the other companies were "successors of, and have assumed the obligations of" Security of America. The six insurance companies answered the complaint and raised, among other defenses, limitations. They also cross-claimed against Chevy Chase which, in turn, cross-claimed against them.

On March 13, 2001, Ms. Pappano filed a Second Amended Complaint, in which she dismissed the six insurance companies sued in the Amended Complaint but added two others—Union Security Life Insurance Company and ABC Insurance Company. Ms. Pappano stated that the name "ABC Insurance Company" was fictitious and was "intended to identify all insurance carriers who were under contract with Chevy Chase to provide or underwrite credit life insurance to or for the benefit of Chevy Chase customers at any time during the interval from July 18, 1994 to August 19, 1996." Concomitant with that pleading, she entered into a stipulation expressly dismissing the six insurance companies with prejudice.

Two days later, in derogation of that stipulation, Ms. Pappano filed a Third Amended Complaint in which the six insurance companies were again added as defendants. She explained that "[t]he identity of the original insurer of the credit life insurance for which the Pappanos applied was unknown to Mrs. Pappano until 1999" and that "[i]t was only after she retained counsel, following which Chevy Chase produced some papers containing the names of insurance companies, that Mrs. Pappano had any indication as to the identity of the carrier." Nowhere in the Third Amended Complaint did Ms. Pappano make any specific allegations as to the times during which any of the eight insurance companies (including the fictitious one) had assumed liability for offering or maintaining credit life insurance for Mr. Pappano. Nor did she allege which companies had contractual arrangements with Chevy Chase in October, 1990, when the first loan was obtained, in July, 1994, when the second loan was obtained, or August, 1996, when Mr. Pappano died.

All of the defendants moved for summary judgment, arguing, among other defenses, limitations. Chevy Chase contended that all of the elements of Ms. Pappano's causes of action were in place when her husband died on August 19, 1996, and that, because she believed at that time that her husband was, in fact, covered by credit life insurance supposedly placed by Chevy Chase, she was on inquiry notice of her claim at that time as well. As the initial suit was not filed until December, 1999—more than three years later—it was time-barred. The insurance companies, added as defendants from and after September, 2000, took that position as well but also noted Ms. Pappano's expressed disbelief, in the Spring of 1997, that there was no insurance. Finding that Ms. Pappano was on inquiry notice of her claims as of her husband's death on August 19, 1996, and that the statute of limitations began to run at that time, the court held the actions barred and granted the motions for summary judgment.

In the Court of Special Appeals, Chevy Chase argued that the Pappanos were on inquiry notice that their application for credit life insurance had not been processed at an even earlier time—within days after the two loan closings, when the Pappanos received no documents regarding the insurance—but that, at the latest, Ms. Pappano was on notice as of the day her husband died. Ms. Pappano argued that "the earliest time that she was put on inquiry notice was in the Spring of 1997, when she made her initial inquiry of [Chevy Chase] as to the existence of credit life insurance coverage and was told that the coverage was on her life, not her late husband's." *Pappano v. Chevy Chase Bank, supra,* 145 Md.App. at 681, 806 A.2d at 340.

The intermediate appellate court correctly recognized that an action "accrues" for purposes of § 5–101 when "the claimant in fact knew or reasonably should have known of the wrong" and that the knowledge necessary is "express cognition, or awareness implied from knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus charging the individual] with notice of all facts which such an investigation would in all probability have

disclosed if it had been properly pursued." *Id.* at 680, 806 A.2d at 339 (quoting *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981), quoting in part *Fertitta v. Bay Shore Dev. Co.*, 252 Md. 393, 402, 250 A.2d 69, 75 (1969)).

The court agreed with the defendants that any breach by Chevy Chase, of either a tort or contract duty, occurred at the date of closing on the loans or shortly thereafter "when the requested policy of insurance was not issued to the Pappanos." *Pappano, supra,* 145 Md.App. at 682, 806 A.2d at 341. It concluded, however, that the reasonableness of Ms. Pappano's conduct in not making immediate inquiry was an issue of fact, and that, on the record then before it, a trier of fact could find that her cause of action did not accrue until the Spring of 1997, when she first made inquiry of Chevy Chase and was told that there was no insurance. Because the court was unable to rule that her failure to make inquiry before then was unreasonable as a matter of law, it held that the issue was not susceptible to resolution on summary judgment, and on that basis reversed the judgments entered in the Circuit Court.

## DISCUSSION

In a nutshell, we agree with the Court of Special Appeals that it was error to enter summary judgment for Chevy Chase. Whether, under the *Poffenberger* standard, Ms. Pappano was on inquiry notice, prior to her first conversation with the Chevy Chase branch manager in the Spring of 1997, that insurance had not been provided on her husband's life is a triable issue of fact, not one that, on this record, may be resolved as a matter of law.

Where the appellate court went astray, however, was in failing to recognize that the insurance companies stood in a much different position. The first six of them were not sued initially until September 5, 2000—well beyond three years after the Spring of 1997, when, by her own admission, Ms. Pappano was told that there was no insurance on her husband's life. As noted, they were effectively dismissed as parties both by stipulation and when dropped in the Second

Amended Complaint, but they were brought back in the Third Amended Complaint. The issues as to them, never addressed by the Court of Special Appeals, are (1) whether Ms. Pappano's alleged lack of knowledge of their supposed involvement prior to September, 1997, makes a difference, and (2) if so, whether her affirmative dismissal of them in conjunction with her Second Amended Complaint on the stated ground that they were not involved served to eliminate September 5, 2000 as the effective date of the suit against them and to make that effective date March 15, 2001, when the Third Amended Complaint was filed.

### *Chevy Chase*

■ Chevy Chase has abandoned its earlier view that the statute of limitations began to run on Ms. Pappano's claim at or just after closing on the two loans. It now contends, as the Circuit Court found, that the statute began to run on the date of her husband's death. Chevy Chase offers two reasons in support of that view, one based on the policy behind a statute of limitations and one based on Maryland Code, § 13–113(a)(1) of the Insurance Article.

### The Policy Issue

We have, in several cases, noted that statutes of limitations are designed to balance the competing interests of the plaintiff, the defendant, and society. The plaintiff's interest is in having a reasonable time within which to determine whether he or she has suffered an actionable wrong and to bring suit. The defendant has an interest in enjoying repose after an unreasonable delay by the plaintiff, so as (1) not to be burdened in his or her defense by the loss of evidence and the fading of memories, and (2) to be able to plan for the future without the lingering uncertainty of potential liability. Society has an interest in judicial economy and also in having disputes resolved and wrongs redressed promptly. The term set in the statute represents the legislative judgment as to how that balance should be struck. *See Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983); *Pennwalt*

*Corp. v. Nasios,* 314 Md. 433, 453, 550 A.2d 1155, 1165 (1988); *Lumsden, et al. v. Design Tech,* 358 Md. 435, 442, 749 A.2d 796, 799 (2000).

■ In Maryland, the general statute of limitations begins to run when the cause of action accrues. Although traditionally an action was deemed to accrue when the wrong complained of was committed (and the time allowed to file suit ran from that date), over the years this Court began chipping away at that approach and substituting instead, for particular kinds of cases, the "discovery rule"—that an action did not accrue until the plaintiff knew or reasonably should have known of the wrong. Finally, in *Poffenberger, supra,* 290 Md. at 636, 431 A.2d at 680, we held that the discovery rule applied "generally in all actions." *See Hecht v. Resolution Trust Corp.,* 333 Md. 324, 334, 635 A.2d 394, 399 (1994).

■ The discovery rule hinges on the concept of inquiry notice, which we described in *Pennwalt Corp.* as follows: "[I]n simple terms, a plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort].' *O'Hara [v. Kovens],* 305 Md. at 302, 503 A.2d at 1324. In such a situation, should the plaintiff fail to seek out the facts supporting a cause of action, it can fairly be said that the plaintiff has inexcusably slept on his rights."

*Pennwalt, supra,* 314 Md. at 448–49, 550 A.2d at 1163. It is evident from this that the commencement of the limitations period is not postponed until the conclusion of the diligent investigation, but continues to run during that period. In *O'Hara v. Kovens, supra,* 305 Md. 280, 289, 503 A.2d 1313, 1317 (1986) we adopted this statement from *Lutheran Hospital v. Levy,* 60 Md.App. 227, 237, 482 A.2d 23, 27 (1984):

"Under the discovery rule as stated in *Poffenberger* limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged

with knowledge of facts that would have been disclosed by a reasonably diligent investigation. The beginning of limitations is not postponed until the end of an additional period deemed reasonable for making the investigation."

In urging that Ms. Pappano was on inquiry notice upon or shortly after her husband's death, Chevy Chase points to (1) the importance which the Pappanos attached to having credit life insurance on Mr. Pappano's life, (2) her belief that such insurance was in force and therefore available to pay all or part of the loan, (3) the fact that she never received any evidence, following the loan closing, that the insurance was in force, and (4) her rather desperate financial straits, all of which, Chevy Chase contends, should have caused her to suspect right away that there was a problem and to commence an investigation—an investigation that would have revealed in August, 1996 what her inquiry ultimately revealed in the Spring of 1997.

Chevy Chase calls our attention to *Trimper v. Porter–Hayden,* 305 Md. 31, 501 A.2d 446 (1985), in which we faced the situation of a person who died of an asbestos-related disease before even being on inquiry notice that the illness that led to his death was caused by exposure to asbestos. His dependents filed a wrongful death action and his personal representative filed what we have traditionally termed a survival action—the action the decedent could have brought had he survived. Both actions were filed more than three years after the decedent's death but, allegedly, within three years after the dependents and the personal representative first became aware that the decedent's illness and death were asbestos-related.

The issue was whether the discovery rule permitted the actions to be filed more than three years after the decedent's death—whether the dependents and the personal representative had the same amount of time as the decedent would have had: three years from discovery. We concluded that the answer was "no." We declined to extend the statute with respect to the wrongful death action because the statute itself

made death the trigger, and application of the discovery rule would be inconsistent with the statute. In light of the close connection between the two actions, we declined to apply the discovery rule to the survival action as well.

*Trimper* does not govern this case. For one thing, we clearly limited the holding in that case to latent disease cases that are instituted initially as survival actions, *id.* at 50, 501 A.2d at 456, and this is not such a case. Ms. Pappano sued on her own behalf, not as a personal representative of her husband's estate nor as his dependent. There is a fair question whether Mr. Pappano's death, along with other circumstances existing at that time, served as a trigger to put Ms. Pappano on inquiry notice, but it would not act, on its own, as the commencement of the limitations period on her actions.

Although Ms. Pappano now seems to acknowledge that she was on inquiry notice, with respect to Chevy Chase, when she was informed in the Spring of 1997 that no insurance existed, there is a fair question whether (1) she had sufficient information before then to put her on inquiry notice of that prospect, and (2) her seven-to ten-month delay in making inquiry of Chevy Chase was reasonable and, if not, what effect should be given to that delay. Some of the facts that might bear on those questions are not in the record before us and will need to be developed on remand.

As we noted, the amounts shown on the monthly statements for insurance do not appear to match the amounts that would be payable based on the quoted premium rate for either single or joint insurance. We cannot tell from those amounts what insurance was in force, and, absent some additional evidence, we doubt that a jury could infer knowledge on Ms. Pappano's part based on those amounts.[3]

---

**3.** As noted, the settlement sheet in connection with the 1990 closing showed a premium for joint coverage of $1.38 per $1,000 and a premium for single coverage of $.83 per $1,000. The policy issued by Security of America showed a premium, for the single coverage, of $.8265 per $1,000. A statement produced for the bank for February, 1991, shows an outstanding balance of $21,515.90 and an amount for

As the party raising the statute of limitations, Chevy Chase bears the burden of establishing that the defense has merit. If it fails to produce sufficient evidence to support the defense—to show that Ms. Pappano was on inquiry notice before December 17, 1996—the ruling must be against it.

## Section 13–113

■ Title 13 of the Insurance Article of the Maryland Code contains provisions governing credit life insurance. Section 13–113 deals generally with claims, and subsection (a)(1) of that section provides that a claimant shall report a claim promptly to the insurer or its designated agent. Although acknowledging that the word "promptly" has yet to be judicially construed, Chevy Chase, citing no direct or analogous authority, contends that it means "immediately"—that "[i]t is reasonable to assume that the legislature sought to have claims of this type reported immediately after the insured dies." Leaping further, Chevy Chase urges that Mr. Pappano's death not only put Ms. Pappano on notice to "immediately make a claim on the policy" but "also commenced the statute of limitations for filing any causes of action that might arise out of claims on the policy." It thus argues that her delay until the Spring of 1997 to investigate the existence of the insurance "did not delay the triggering of the prompt reporting mandate and should not delay the commencement of the statute of limitations."

There are a number of problems with that argument. For one thing, we do not accept Chevy Chase's construction of "promptly" as meaning "immediately." If the Legislature intended to require that credit life insurance claims be filed immediately—something that, in many instances, would be

---

insurance of $16.02, which does not match any of the three rates for that amount of coverage. The same discrepancy appears with respect to the March and April, 1991 statements. Because neither the polic(ies), nor the effective premiums on them, in effect after the Security of America policy was supposedly terminated in 1994 are in the record, there is no way that we can match the premiums shown on the later statements.

wholly impracticable—it would have said so. That it did not intend such a strict requirement is bolstered by its declaration in § 13–102 that its purpose was to promote the public welfare by regulating credit life insurance (not by regulating beneficiaries of credit life policies) and that the title was to be construed liberally. There may be a variety of reasons why persons entitled to make a claim on a credit life policy may delay doing so—they may not know of the insurance (or even of the loan) right away, they may be minors or physically or mentally unable to make a claim, or the claim may need to be made by a personal representative, who may not be appointed for some time after the decedent's death.

Equally important, there is nothing in § 13–113 to indicate that it was intended to affect the running of a statute of limitations. If there *had* been a policy of insurance on Mr. Pappano's life, subject to any contractual provision in the policy regarding the prompt filing of claims, Ms. Pappano would have had three years under the statute of limitations to make a claim. A proper claim filed within that period could not be defeated because it was not filed "immediately" after the decedent's death. Here, of course, there was no policy, so, even if the statute had some bearing on when a claim should be made on a policy, it has no relevance to when a tort or breach of contract claim based on the failure to provide such a policy must be filed.

### *The Insurance Companies*

■ The Court of Special Appeals seemed to treat the eight insurance companies named as defendants in the Third Amended Complaint as being in the same position as Chevy Chase. They clearly were not in that position. The earliest suit against the first six—Security of America and its allied companies—came on September 5, 2000—more than three years after Ms. Pappano acknowledges that she was on inquiry notice that there was no insurance on her husband's life.

Ms. Pappano seeks to defend her delay on the basis that she was unaware that some of the insurance companies had any involvement with Chevy Chase until after suit was filed

against that bank. With respect to Security of America and its allied companies, that is simply not the case. Ms. Pappano admitted that the agreement between Chevy Chase and Security of America was disclosed to her in August, 1999—four months before she filed suit against Chevy Chase. With respect to the others, although Chevy Chase did not immediately disclose all of the documents sought in discovery, there is no evidence that either it or any of the insurance companies fraudulently concealed the existence of the insurance companies from Ms. Pappano. By her own admission, she was on inquiry notice in the Spring of 1997 that the insurance contracted for on her husband's life was not in effect. She had three years from that point to learn why and to discover who was responsible. As we have indicated, the limitations period is not tolled until her investigation bears fruit; it runs from the time she was on inquiry notice. The actions against the insurance companies are clearly barred, and summary judgment was properly granted as to them.[4]

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY AS TO DEFENDANT INSURANCE COMPANIES, TO REVERSE JUDGMENT AS TO CHEVY CHASE DEFENDANTS, AND TO REMAND CASE AS TO CHEVY CHASE DEFENDANTS FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID ONE–HALF BY CHEVY CHASE DEFENDANTS AND ONE–HALF BY RESPONDENT PAPPANO.

---

4. Because the action against the six insurers initially sued on September 5, 2000, is barred, we need not consider the effect of Ms. Pappano's later dismissal of them and her attempt on March 15, 2001, to sue them again. As noted, Chevy Chase cross-claimed against the six insurance companies which, in turn, cross-claimed against Chevy Chase. So far as we can tell, no limitations argument has been made with respect to the Chevy Chase cross-claims.