854 A.2d 1269

**The BANK OF NEW YORK, Trustee, et al.**

**v.**

**Ronald SHEFF, et al.**

**No. 137, Sept. Term, 2003.**

Court of Appeals of Maryland.

July 28, 2004.

236

William A. Davis (Noam B. Fischman, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., on brief), Washington, DC, for appellants.

Gerson A. Zweifach (Joseph G. Petrosinelli, John E. Joiner, Lucius T. Outlaw, III, Williams & Connolly, LLP, Washington, DC, Kevin J. McCarthy, McCarthy & Costello, Bowie, on brief), for appellees.

Argued before BELL, C.J., RAKER, WILNER, HARRELL, BATTAGLIA, GREENE, ELDRIDGE, JOHN C. (Retired, Specially Assigned), JJ.

WILNER, J.

This action arises from the sale of nearly $50 million in tax-exempt revenue bonds by Prince George's County, Maryland, in 1993. The ultimate recipients of the net proceeds and the true borrowers were health care providers in the District of Columbia–Prince George's County area that comprised the Greater Southeast Healthcare System. Everyone agrees that the county acted merely as a conduit; it issued the bonds, received the proceeds of the sale, and immediately passed the proceeds on to the borrowers which, alone, were responsible for repayment. The county had no obligation to the bondholders for repayment.

Part of the security for repayment of the bonds was a lien on the assets of the individual health care providers and their subsidiaries, including their accounts receivable. In order to perfect that lien, it was necessary to file a UCC Financing Statement with the Maryland State Department of Assessments and Taxation (SDAT), with the Clerk of the Circuit Court for Prince George's County for the health care providers located in the county, and with the District of Columbia Recorder of Deeds for the health care providers located in the District.

Financing statements were appropriately filed with SDAT and with the Clerk in Prince George's County, but, unfortunately, a financing statement was not filed with the D.C. Recorder of Deeds, and, as a result of that lapse, the bondholders lost the opportunity to perfect against third parties a first lien on the receivables of the entities located in the District, one of which was the 483–bed Greater Southeast

Community Hospital (GSCH). That became a problem when the consortium defaulted on the bonds and it was discovered that another creditor, Daiwa Healthco–2 LLC, had obtained a first lien on the receivables of GSCH in 1997.

The Bank of New York, as trustee for the bondholders, and four municipal bond funds that hold the bonds, led by Eaton Vance Municipal Bond Fund, blamed one of the law firms that acted as counsel for the county in the transaction, Piper & Marbury (now Piper Rudnick) (P & M), for the failure to file a financing statement in the District. They sued the firm in the Circuit Court for Prince George's County for negligence (legal malpractice) and breach of fiduciary obligation.[1] Finding no genuine dispute of material fact, the court, upon concluding that (1) P & M did not act as counsel to the bondholders and had no obligation to them, (2) P & M never assumed a duty to file the financing statement in the District, and (3) even if there were liability on P & M's part, the action was barred by limitations, granted summary judgment to the defendants. The plaintiffs appealed. On our own initiative, we granted *certiorari* prior to proceedings in the Court of Special Appeals, and, convinced that the action is barred by limitations, we shall affirm.

## BACKGROUND

Most any bond sale is a complex transaction, and this one was no exception. There were eight borrowers who were part of the consortium (one of which owned several health care facilities, including GSCH), a corporate trustee for multiple bond purchasers, six underwriters, and the county. Over 70 documents were drafted, circulated, and negotiated, and it appears that five law firms were involved in planning and consummating the transaction. Each of the law firms was assigned responsibility for drafting documents. Among the documents assigned to P & M to draft were general certificates of the borrowers, the Trust Indenture, the Loan Agree-

---

1. The suit also named as defendants two individual lawyers from P & M who worked on the transaction. For convenience, we shall refer to the defendants, collectively, as P & M.

ment, the Master Indenture, bond counsel opinions, and "Financing Statement Covering the Receipts."

The financing statements were obviously an important part of the transaction, and they were dealt with in a number of the documents. The Loan Agreement between the county and the borrowers and the Master Trust Indenture entered into by the borrowers and the trustee for the bondholders each put the obligation to file all necessary financing statements on the borrowers—the health care providers who ultimately received the bond proceeds.[2]   Section 3.05 of the Loan Agreement stated:

> "The Borrowers shall keep, record and file, at the expense of the Borrowers, all necessary financing statements and renewals thereof, in such places as may be required by law in order to preserve and protect fully the security of the holders of Bonds and the rights of the County and the Trustee."

Section 4.02(b) of the Master Trust Indenture contained a nearly identical requirement, although it referred to the health care providers as the "Obligated Group Members" rather than as "Borrowers."   Section 6.12 of the Indenture of Trust required the Borrowers, "[i]n accordance with Section 3.05 of the Loan Agreement," to file "such continuation statements as may be required by the District of Columbia Uniform Commercial Code and the Maryland Uniform Commercial Code ... in order to continue perfection of the security interest of the Trustee in such items of tangible or intangible personal property ... and provide a stamped copy of such continuation statements to the Trustee prior to the expiration of the financing statements."

In conformance with its assignment to draft financing statements, P & M drafted and circulated such statements for filing with SDAT and the Clerk of the Circuit Court for Prince George's County.   The statements drafted by P & M instruct-

---

**2.**   At oral argument, we were advised that it is common in transactions such as this one to put the obligation to secure the lender's lien on the borrowers.   That does strike us, however, as akin to directing the fox to guard the chicken house.

ed the filing officer to return the statement, after recordation, to P & M. P & M did not draft a financing statement for filing in the District, however; nor did anyone else. Comments were received on the first drafts of the statements, and changes were made prior to closing. P & M, whose main office was in Baltimore, filed the financing statement with SDAT in Baltimore on the morning of the closing, paid the filing fee for that statement, and brought stamped copies of the filed statement to the closing. The financing statement prepared for filing in Prince George's County was given to local counsel for the county, Robert Ostrom, and he saw to its signature by the appropriate county official and its filing with the Circuit Court Clerk.

At the pre-closing on May 12, 1993, all documents to be filed, including the financing statements for SDAT and Prince George's County, were circulated to the lawyers for all parties for final approval. Following the formal closing on May 13, P & M prepared and circulated to all parties, including the trustee, a Closing Binder that contained all transaction documents. Because a financing statement for filing in the District had not been prepared, no such document appeared in the Binder. Notwithstanding everyone's knowledge that some of the borrowers, including GSCH, were located in the District of Columbia, no one complained about (or apparently noticed) the lack of a financing statement for filing in the District, and no one filed such a statement.

By 1997, apparently as the result of significant changes in Medicaid and managed care reimbursement policies, the System's financial status had deteriorated. In April of that year, GSCH—a major constituent entity of the System—entered into an agreement with Daiwa–Healthco–2 LLC (Daiwa) under which Daiwa purchased $15 million of selected Government and insurance company receivables held by GSCH. A stated condition to the purchase, articulated in the agreement, was that GSCH was the legal and beneficial owner of the receivables "free and clear of any [l]iens," that Daiwa would receive "valid ownership of each Receivable . . . subject to no third-party claims of interest thereon," and that "[n]o effective

financing statement or other instrument similar in effect covering any Receivable or the Collections with respect thereto is on file in any recording office, except those filed in favor of [Daiwa]." The agreement also required that, prior to closing, Daiwa receive time-stamped copies of financing statements showing Daiwa as a secured creditor with respect to the purchased accounts and, if necessary, releases or termination statements evidencing the release of all security interests or other rights previously granted by GSCH in the receivables.

Prior to closing, GSCH sent a copy of the transaction documents to the Bank of New York (BNY), which, since 1995, had acted as trustee for the 1993 bondholders, to make sure that the trustee was aware of the transaction and to obtain any consents that might be necessary.[3] Knowing that Daiwa would insist on having a first lien on the receivables, counsel for GSCH had already made a search for liens against the receivables, found the filing in Prince George's County, but found nothing in the District of Columbia. A trust officer for BNY, acknowledging the Bank's responsibility for protecting the interests of the bondholders, scanned the documents and forwarded a copy of them, along with "[a]ll the relevant bond documents," to BNY's counsel, noting that GSCH was setting up a receivable financing *that was not in the ordinary course of business* and that the parties needed the trustee's "permission/authorization."

Counsel was asked to review the documents and "verify that such transactions are allowed." Counsel billed BNY for reviewing the documents, including the Daiwa purchase agreement, a bill that BNY forwarded to GSCH for reimbursement.[4] The controller for GSCH believed that BNY had "approved" the transaction.

---

**3.** Upon assuming its role as trustee, BNY was given all relevant documents pertaining to the transaction by the former trustee, including the assignment of drafting responsibilities and the Closing Binder.

**4.** The attorney, though claiming that she reviewed the indentures, did not recall reviewing the purchase agreement, notwithstanding that the bill charged for that service.

Notwithstanding the Daiwa purchase, the System's financial condition continued to worsen. In June, 1998, Moody's Investors Service downgraded the System's debt rating from Baa3 to Ba3 and put it on a watchlist for further downgrading, noting that the downgrade affected the 1993 bonds. Contemporaneously, Fitch IBCA downgraded the bonds from BBB+ to BB. A month later, Moody's downgraded the bond rating to B1; in November, 1998, it downgraded the bonds to Caa3.

Possibly as early as June, 1998, but in any event by September, 1998, an analyst with Eaton Vance Management, one of the municipal bond funds holding the 1993 bonds, became aware of the Daiwa agreement—that GSCH had sold to Daiwa receivables supposedly pledged to the bondholders—and that GSCH's performance had significantly deteriorated in 1997–98. On October 16, 1998, he faxed a letter to the Assistant Treasurer of BNY in reference to the bonds, asking whether the receivables had "been perfected" and whether the "UCC's [had] been filed." Although he spoke with someone at BNY in regard to the letter, he never got a response as to whether the receivables had "been perfected." He was told that UCC statements for Maryland, good for 12 years, had been filed in May, 1993, but received no information regarding any filing in the District. The analyst believed that he asked for copies of the financing statements but never received them from BNY.

Concerned that the sale of receivables to Daiwa might constitute a violation of the bond documents—a concern that Eaton Vance expressed in a meeting that it had with GSCH in mid-November, 1998—the firm employed the law firm of Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., to render legal advice concerning the sale. The record reveals that the firm was so employed on or before November 20, 1998. In the course of its investigation, the firm did a UCC filing search on GSCH and faxed the result to Eaton Vance on November 24, 1998. Based on its review of that information, Eaton Vance learned that UCC financing statements were not on file in the District of Columbia.

Upon learning that it did not have a perfected lien on the receivables sold to Daiwa, the trustee commenced negotiations with the System to obtain replacement collateral. When those negotiations failed, BNY, on May 26, 1999, formally declared a default on the bonds. The next day, four of the System members, including GSCH, initiated Chapter 11 bankruptcy proceedings in the District of Columbia. During the course of the bankruptcy, a buyer purchased GSCH's assets for over $21 million, and the parties entered into a settlement agreement dividing the proceeds. Part of that settlement involved the exchange of mutual releases, and in one of those releases BNY released the bondholders' claims against the System— the party charged by the Loan Agreement, the Master Trust Indenture, and the Indenture of Trust with filing the financing statements in the appropriate places. The Chapter 11 plan became effective November 5, 2001.

Just over two weeks later, on November 23, 2001, BNY and the four bond funds sued P & M in the Superior Court for the District of Columbia. The court dismissed that action on August 7, 2002, on the ground of *forum non conveniens*, finding that Maryland had a substantial public interest in having the action litigated here. On August 28, 2002, BNY and Eaton Vance filed this suit in the Circuit Court for Prince George's County.

## DISCUSSION

As noted the Circuit Court concluded, as a matter of law, that (1) P & M neither had nor assumed any duty to the trustee to record the financing statement in the District of Columbia, and (2) even if it had or assumed such a duty, the plaintiffs were on inquiry notice more than three years before suit was filed in the Superior Court in Washington that the firm had not, in fact, filed such a statement, and that their actions were therefore barred by limitations.[5] We agree with

---

5. BNY and Eaton Vance trace the limitations period back from November 23, 2001—when the action was filed in the District of Columbia Superior Court—rather than from August 28, 2002, when the action

the latter conclusion and therefore need not address the former.

Litigants have three years from the date their action accrues to file a civil action. Maryland Code, § 5–101 of the Cts. & Jud. Proc. Article. Maryland applies the "discovery rule" in determining when an action accrues. *American General Assur. Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003). Under that rule, the statute of limitations begins to run when "the plaintiff has 'knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [cause of action].'" *Pennwalt Corp. v. Nasios,* 314 Md. 433, 448–49, 550 A.2d 1155, 1163 (1988), quoting from *O'Hara v. Kovens,* 305 Md. 280, 302, 503 A.2d 1313, 1324 (1986). *See also American General Assur. Corp. v. Pappano, supra,* 374 Md. at 351, 822 A.2d at 1219.

Like any other issue that is fact-dependent, if there is any genuine dispute of material fact as to when the plaintiffs possessed that degree of knowledge, the issue is one for the trier of fact to resolve; summary judgment is inappropriate. *O'Hara v. Kovens, supra,* 305 Md. at 300–01, 503 A.2d at 1323–24. If there is no such genuine dispute, however, and the question of whether the plaintiffs were on inquiry notice more than three years before their suit was filed can be determined as a matter of law, summary judgment on that issue is, indeed, appropriate.[6]

---

was filed in the Circuit Court for Prince George's County. Presumably, although they do not mention it, the plaintiffs are relying on Maryland Rule 2–101(b) in support of that view. As P & M does not contest that November 23, 2001 is the critical date, we shall assume, without deciding, that the Rule applies and was satisfied, and that the action in the District of Columbia effectively tolled the limitations period for filing the Maryland action.

6. The plaintiffs complain that the Circuit Court made "no findings of fact" regarding the limitations defense. That is not entirely the case. The court determined that, although the case could be decided solely on the issue of duty, it concluded that the action was also barred by

■ P & M urges that the trustee was on inquiry notice that P & M had not prepared or filed a financing statement in the District in May, 1993, when it received the Closing Binder that contained all of the closing documents, including financing statements filed with SDAT and the Clerk in Prince George's County, but did not contain a financing statement for the District. Had the trustee made an inquiry at that time (or had BNY made such an inquiry in 1995, when it assumed the trusteeship and became privy to all of the relevant information possessed by the former trustee), it would have discovered, immediately, that a financing statement had not, in fact, been filed in the District and that it did not, therefore, have a perfected lien on the receivables of GSCH. BNY responds that the trustee had a right to rely on P & M to perform its duty and therefore had no reason to question its work.

There is no dispute of material fact with respect to that issue. If, *arguendo*, P & M *did* have a duty to file the financing statement in the District, the absence of such a statement from the Closing Binder should certainly have alerted the trustee to the real prospect that the firm had not performed that duty, especially when the Binder contained the statements filed with SDAT and the Clerk in Prince George's County. The omission of that document did, indeed, give the trustee reason to question whether P & M had filed the statement.

P & M adds that, even if the trustee was not on inquiry notice in 1993, it clearly was in April, 1997, when it learned of the proposed Daiwa transaction. As noted, GSCH sent to the trustee a copy of the transaction documents, which recited that GSCH was the legal and beneficial owner of the receivables to be purchased by Daiwa "free and clear of any [l]iens," that Daiwa would receive valid ownership of the receivables "subject to no third-party claims of interest thereon," and that "[n]o effective financing statement ... covering any Receiv-

---

limitations. In that regard, it expressly adopted the reasons stated in the defendants' motion for summary judgment and at the oral argument on that motion, which were the points noted above.

able or the Collections with respect thereto is on file in any recording office." A BNY trust officer read enough of the documents to conclude that GSCH was setting up a receivable financing that was "not in the ordinary course of business" and that the parties needed the trustee's permission or authorization. Concerned, he sent the documents to counsel for the Bank with a request to "verify that such transactions are allowed." There is no dispute as to that fact. Unquestionably, BNY was on inquiry notice that it did not have a perfected lien on GSCH receivables; it could not have such a lien if Daiwa was about to purchase the receivables free and clear of any such lien. That necessarily raised the question of whether a proper financing statement had been filed in the District of Columbia.

BNY makes the curious response that, because it received a Compliance Certificate attesting that GSCH was authorized to engage in the transaction, it had no reason to read the documents and had no authority to disapprove the transaction. That is not the issue. The Compliance Certificate simply confirmed what the other documents implied—that BNY did not have a perfected lien on the GSCH receivables. The Certificate was accurate; its accuracy, indeed, was the final alarm. The Bank was undisputedly on inquiry notice when its trust officer sent the documents to counsel to investigate whether the proper financing statements had been filed. The Bank *did* initiate an inquiry; unfortunately, it failed to follow up when it did not get a clear response from its lawyer. Had it done so, it would have discovered almost immediately that no financing statement had been filed in the District.

■ Quite apart from whatever knowledge may have been possessed by BNY, Eaton Vance urges that "the undisputed facts show that Eaton Vance had no inkling that there was any problem with the financing statements on file before November 23, 1999." That is simply not true. Indeed, the undisputed facts show exactly the opposite. As we have indicated, at least by September, 1998, Eaton Vance was aware of the Daiwa agreement. On October 16, 1998, one of its analysts

faxed a letter to BNY asking whether the receivables had "been perfected." That alone demonstrates inquiry notice. At some point on or prior to November 20, 1998, having not received a satisfactory answer from the bank, it employed a law firm to investigate the matter.

The fundamental error in Eaton Vance's view is its apparent belief that limitations did not begin to run until the firm actually discovered that no financing statement had been filed by P & M in the District of Columbia. That is not the case. Limitations began to run when the firm was on inquiry notice that financing statements may not have been filed, triggering a duty on its part to make an investigation that, if diligently pursued, would have revealed the sad fact.

On the record before us, it is clear, as a matter of law, that this action was barred by limitations.

JUDGMENT AFFIRMED, WITH COSTS.