875 A.2d 823

Nona K. CHRISTENSEN, et al.

v.

PHILIP MORRIS USA INC., et al.

No. 02136 Sept. Term, 2003.

Court of Special Appeals of Maryland.

June 8, 2005.

Edward J. Lilly (Theodore M. Flerlage, Law Offices of Peter G. Angelos, on the brief), Baltimore, MD, for appellant.

Bruce D. Ryder (J. William Newbold, Michael B. Minton, on the brief), St. Louis, MO, (Kathleen M. McDonald, on the brief), Baltimore, MD, for appellee.

Panel: HOLLANDER, SHARER, CHARLES E. MOYLAN, JR., (Retired, specially assigned) JJ.

HOLLANDER, J.

This appeal involves the interplay of the statute of limitations, the discovery rule, and the doctrine of equitable tolling, and the competing policies that support each one. Russell E. Christensen ("Christensen" or the "Decedent"), was diagnosed with lung cancer in mid 1998. Although Christensen had been a cigarette smoker for thirty years, he had ceased smoking more than twenty years before he was diagnosed with lung cancer, from which he died on January 17, 2001, at the age of seventy-three.

On August 13, 2001, Nona Christensen, appellant, the Decedent's widow, individually and as Christensen's personal representative, brought a survival and wrongful death action [1] against a host of tobacco manufacturers and related entities. They include appellees Philip Morris USA Inc. ("Philip Morris"); [2] Lorillard Tobacco Co.; and Liggett Group, Inc. ("Liggett"), manufacturers of cigarette products, and appellees Giant Food, LLC ("Giant"); Crown Service, Inc.; George J. Falter Co., Inc.; and A & A Tobacco Company, Inc., entities

---

1. *See,* respectively, Md.Code (1974, 2001 Repl.Vol.), § 7–401(4) of the Estates and Trusts Article and Md.Code (1974, 2002 Repl.Vol.), §§ 3–901—3–904 of the Courts & Judicial Proceedings Article.

2. Philip Morris USA Inc. was previously known as Philip Morris Incorporated.

involved in the sale and distribution of cigarettes.[3] Ms. Christensen sought compensatory and punitive damages based on strict liability (failure to warn), fraudulent misrepresentation, fraud by concealment, loss of consortium, and conspiracy. The suit was amended on September 25, 2002, to add as plaintiffs the Decedent's two adult children: appellants Eric Lowell Christensen (born August 14, 1963) and Lisa Marie Christensen Kelly (born December 10, 1960).

With one exception, all of the appellees in this case had previously been sued in a class action brought in Maryland by smokers, former smokers, and their families. Although Christensen was not a named party in the class action, he was a potential class member. The case *sub judice* was filed several months after the class action was decertified by the Court of Appeals in *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200 (2000).

Appellees moved for summary judgment in this case, alleging that suit was barred by limitations because the Decedent knew in the Spring of 1998 that he had lung cancer, and thus was on inquiry notice at that time. In response, appellants claimed, *inter alia*, that Christensen's claim did not accrue until September 1998, when he learned that his cancer was caused by cigarette smoking. Moreover, they suggested that, because Christiansen was an ex-smoker for more than two decades, he lacked sufficient knowledge at the time of diagnosis to link his lung cancer to smoking.

The circuit court granted appellees' motion. Among other things, it concluded that the claims accrued more than three years before suit was filed, and that limitations was not tolled during the pendency of the unsuccessful class action suit.

On appeal, appellants present the following three questions:

---

**3.** Appellant also sued I.K. Candy, Tobacco & Hosiery Co. ("Candy"). On September 26, 2002, the circuit court granted Candy's summary judgment motion, because "Christensen last smoked in 1976," and Candy "was not in existence until May 1982." The court also dismissed the suit as to the parent corporation of Philip Morris USA Inc. and certain affiliates of Liggett.

I. Did the trial court err in refusing to consider whether the statute of limitations was tolled during the pendency of the Maryland class action tobacco case?

II. Did the trial court err in granting summary judgment in favor of the defendants as to Appellant's survival action on the ground that the action was barred by limitations?

III. Did the trial court err in declaring that Appellant's wrongful death claims were barred by the statute of limitations?

For the reasons set forth below, we shall reverse and remand.

### FACTUAL SUMMARY[4]

Christensen was born in 1927 and was well educated. He worked for a period of time as a teacher and then as a school principal. In 1970, he obtained his law degree.

In May 1996, the case of *Richardson v. Philip Morris Inc.* was filed in the Circuit Court for Baltimore City against various manufacturers of tobacco, their Maryland distributors, and others, seeking damages on behalf of the named plaintiffs and similarly situated "Maryland residents (a) who have suffered or continue to suffer from physical injuries or disease caused by smoking cigarettes or using smokeless tobacco products, and/or (b) who are nicotine dependent and plead addiction as an injury." *Philip Morris Inc.*, 358 Md. at 700, 752 A.2d 200. The *Richardson* plaintiffs moved for class certification in September 1997. *Id.* at 701, 752 A.2d 200. In January 1998, pursuant to Md. Rule 2–231(b)(3), the circuit court approved for class action treatment some eight tort and contract causes of action, one consumer protection claim, and one claim for "medical monitoring." *Id.* Thereafter, the circuit court issued an order certifying two classes. In general, the classes consisted of: a) Maryland residents (or their estates

---

4. Our factual summary is gleaned from the parties' exhibits, submitted in connection with the summary judgment motion.

and families) who, as current or former smokers, sustained injury, illness, or death caused by cigarettes, and b) those who were "nicotine dependent persons...." *Id.* at 701, 752 A.2d 200. Unhappy with the class certification, the defendants filed a petition in the Court of Appeals for a writ of mandamus or prohibition, asking that Court to "direct" the circuit court to vacate the class certification. *Id.* at 699, 752 A.2d 200.

Christensen was not a named party in *Richardson*, nor did he move to intervene in the class action. However, he was a potential class member. Moreover, all of the appellees (except Giant) were aware of Christiansen's status as a putative class member. In particular, on May 11, 1999, Christensen provided an affidavit for the plaintiffs in the *Richardson* case, describing his smoking history and the history of his lung cancer. And, in June 1999, he provided a videotaped *de bene esse* deposition in the *Richardson* case. At his deposition, Christensen was represented by appellants' present counsel, who were also the attorneys for the plaintiffs in *Richardson.*

In an opinion dated May 16, 2000, issued in the *Richardson* case, the Court of Appeals granted the relief of mandamus and ordered the circuit court to decertify the class. *Philip Morris Inc.,* 358 Md. at 699, 787–88, 752 A.2d 200. Thereafter, on March 13, 2001, the parties in the *Richardson* case filed a "Stipulation of Dismissal" in the circuit court, in which they agreed that, for the purpose of limitations, any claims reasserted by the named parties within six months of the dismissal would be deemed filed on the same date that *Richardson* had been filed. The Stipulation, however, did not extend to the claims of the parties in the case *sub judice.* As noted, the suit at issue here was filed on August 13, 2001.

In September 2003, appellees moved for summary judgment in the case *sub judice,* claiming that appellants' claims were barred by limitations. According to appellees, Christensen had both actual and inquiry notice of his claims more than three years before suit was filed on August 13, 2001. Appellees asserted, in part:

By his own admission, Mr. Christensen knew before August 13, 1998 that he had lung cancer, which he attributed to

smoking, and was thus on notice of his possible claims more than three years before suit was filed. Indeed, Mr. Christensen had reason to suspect, *as early as the Fall of 1997 and clearly no later than the Spring of 1998*, that he might have been injured by smoking, and was thus on at least inquiry notice of his potential claims by that earlier time. Plaintiffs' survival claims, which were not filed until more than three years later, are thus time-barred.

Further, because any direct claim by Mr. Christensen is time-barred, Plaintiffs' wrongful death claim is also barred. This is a consequence of the plain language of Maryland's Wrongful Death Act, which provides that if the decedent's claim would be barred, any wrongful death claim by his beneficiaries also cannot succeed.

In support of their motion, appellees submitted numerous exhibits, including the Decedent's affidavit and deposition testimony from the *Richardson* case. Appellees also provided the deposition testimony of the Decedent's physicians and family members, as well as some of his medical records.

In their opposition, appellants argued that Christensen did not have actual or inquiry notice of his lung cancer until September 1998, when he obtained the results of a needle biopsy that was performed on August 13, 1998. Further, they argued that the wrongful death claims were not barred because suit was filed within three years of Christensen's death. In addition, they asserted that "[a]ll statutes of limitations applicable to the action filed by [appellants] were tolled by their membership in the *Richardson* Tobacco Class Action and no statute of limitations applicable to the Christensen action began to run until class decertification on June 15, 2000." Appellants also submitted additional medical records and deposition testimony.

According to Christensen's affidavit[5] and deposition, he began smoking cigarettes in 1940 or 1941, when he was

---

5. We were unable to locate in the Record Extract a signed, dated copy of the affidavit. However, by the time Christensen completed his

fourteen years old, "because it was the thing to do." He changed brands over the years, and eventually his smoking habit increased to two packs a day. At some point during the 1950's or 1960's, Christensen "became aware generally" of the "health hazards associated with cigarette smoking." Moreover, he was familiar with the Surgeon General's warning on the side of the cigarette packaging.

In approximately 1968, Christensen ceased smoking cigarettes in his home, car, and around his family, for a variety of reasons. During the early 1970's, the effects of approximately thirty years of smoking began to affect Christensen's health. He averred in his affidavit that because he "developed an early morning cough," he "attempted to cut back [his] cigarette consumption."

Ms. Christensen, who was employed by the Maryland Department of Health and Mental Hygiene in the 1970's, enrolled her husband in the Johns Hopkins Lung Project (the "Project"), which was gathering data on smokers. Christensen joined the Project in approximately 1974 and remained a participant until 1982. He explained:

Well, once a month we would go down and breathe in this—I don't know what it was called, a machine, breathalyzer which injected saline solutions into your lungs, and you breathed on that until it caused you to dispense sputum, and then they would take that sputum and analyze it.

They would send you home with little jars, and every morning you would sit over the stove and breathe your own concoction of saline solution, and then they would give you x-rays and take that data. I never received a report. Basically that is what it was.

According to Christensen, on January 15, 1976, a representative of the Project contacted him and told him that he had an unidentified "lung problem." On that day, after thirty-five years of smoking, Christensen quit, "cold turkey." Moreover,

---

affidavit, he already knew his lung cancer was "terminal" and that he had "only a matter of months to live."

he testified that he never resumed smoking cigarettes. Christensen recalled: "Certain days . . . scare the hell out of you, and that was one of them. You just don't forget."

Christensen acknowledged that he was "fully aware" of the association between smoking and lung cancer when he received the call from Johns Hopkins in January 1976. The following deposition testimony is pertinent:

[QUESTION]: [6] What was the result of your being advised you had a lung problem?

[MR. CHRISTENSEN]: Well, since this was a study on the causes of smoking on your lungs, I immediately felt that there was a possibility of cancer, and as a result, I stopped smoking right that very day.

\* \* \*

[QUESTION]: . . . . Tell me why you decided to quit in 1976.

[MR. CHRISTENSEN]: Because I was scared to death.

[QUESTION]: Why?

[MR. CHRISTENSEN]: I had received a call from Johns Hopkins Hospital that I had a lung problem. That was the end of the conversation. They said we think you have a lung problem, and at that time I had just—I recall it like it was yesterday. I had just purchased a pack of cigarettes, and I picked them up, crumbled them up and threw them in my waste paper basket, and that is the last cigarette I have ever bought or purchased or smoked. It was that simple.

[QUESTION]: On the basis of that one telephone conversation with the doctor?

[MR. CHRISTENSEN]: That is right.

[QUESTION]: *You threw them away and never picked up another cigarette in your entire time?*

---

6. Because of the number of lawyers involved in the *Richardson* case, and because we have not consistently been provided with the names of the attorneys posing particular questions, we have used the generic word, "Question," without reference to who posed the question.

[MR. CHRISTENSEN]: *Never.*

(Emphasis added).

Christensen learned more about his "lung problem" in a conversation with a Project employee a few weeks after the call in January 1976. The following deposition testimony is noteworthy:

[QUESTION]: Tell me to the best of your recollection the substance of this second conversation regarding your lung problem.

[MR. CHRISTENSEN]: The sum and substance of the conversation was that I had a spot on my lower right lung and a spot on the upper left lung.

[QUESTION]: Do you recall them being described as spots or lesions?

[MR. CHRISTENSEN]: Well, I don't recall. I think it was spots.

[QUESTION]: During this second conversation that we're speaking of, did you make inquiry as to the nature of these spots on your lungs?

[MR. CHRISTENSEN]: No, I did not. I don't believe it was necessary, because they made no big issue out of it.

They didn't tell me whether to stop smoking. As a matter of fact, they didn't really want me to stop smoking, because that would defeat the purpose of the project.

[QUESTION]: Did they tell you or did you ask what was the possible cause of these spots on your lungs?

[MR. CHRISTENSEN]: I don't believe I had to ask them.

[QUESTION]: Why do you say that?

[MR. CHRISTENSEN]: Because this project was to determine the effect of smoking on the person's lung. I think it's self evident.

[QUESTION]: You intuitively knew then, as I understand your testimony, that when you were advised of this lung problem, you were advised of these spots on your lungs, you intuitively knew that those spots and the lung problem were caused by your smoking; is that what you are saying?

[MR. CHRISTENSEN]: No, I'm not. I—when I received the phone call and knowing that this was a project for lung cancer—or for smoking, not lung cancer, but for smoking on a person's lungs, I immediately assumed the worst.

*And had it been cancerous, I am certain that whomever I talked to would have told me that it was cancer.* I would have no other reason to believe otherwise.

But when you are in a project that involves smoking and you come up with lung—spots on your lung, you tend to believe the worst, and I did.

[QUESTION]: And you thought that at least there was a possibility that these spots on your lungs might be lung cancer, right?

[MR. CHRISTENSEN]: There's a possibility, yes.

[QUESTION]: *And you also kind of had this intuitive sense that one of the possible causes of those spots was your cigarette smoking, right?*

[MR. CHRISTENSEN]: *It would be the only cause that I could think of.*

(Emphasis added).

Christensen informed his personal physician about the information he received concerning his lungs. The doctor also "received copies of the report." According to Christensen, his doctor "didn't seem concerned." Nor did Christensen believe his "lung problem" was serious, given that he "was in good health" and "had no ill feelings." Therefore, at that time, Christensen did not pursue any course of treatment for the "lung problem."

Moreover, Christensen averred in his affidavit that, until mid 1998, he believed he "was in generally excellent health." Then, some twenty-two years after he quit smoking, Christensen experienced a progressive decline in his health. He recalled: "I noticed and observed that I was having increasing difficulty walking and attempting to climb. I was suffering from shortness of breath and uncharacteristic fatigue."

Ms. Christensen recalled that her husband's condition "was getting progressively worse...." However, she thought at the time that it was perhaps emphysema; she did not think he had cancer. The following deposition testimony of the Decedent's daughter is also pertinent:

[QUESTION]: And when you say [the Decedent] was having some trouble breathing, I take it, from what you were saying, it was noticeable?

[MS. KELLY]: Yes.

[QUESTION]: Would he get winded from ordinary activities, or can you explain the type of difficulty he was having?

[MS. KELLY]: He couldn't walk across my back yard without being out of breath.

[QUESTION]: Okay. When did you first notice that?

[MS. KELLY]: Well, datewise ... it was probably the previous Fall [i.e., 1997], because he was still trying to help me do lots of projects around this house.

[QUESTION]: And was it something that was sporadic, or was it sort of something that was becoming more and more frequent, was it becoming a constant problem, the shortness of breath?

[MS. KELLY]: The shortness of breath was pretty consistent.

[QUESTION]: Did he complain about it at all?

[MS. KELLY]: He complained by sitting down to catch his breath. He just really couldn't do anything. He would just sit down.

\* \* \*

[QUESTION]: Did you discuss why he was getting short of breath?

[MS. KELLY]: Oh, I would ask him. Suggest that he get it checked out, that that is not normal.

\* \* \*

[QUESTION]: And what would he say to you? Tell me about your conversation.

[MS. KELLY]: He would just kind of put it on the back burner.

\* \* \*

[QUESTION]: But, he was honest about it, if he felt sort [sic] of breath, he would sit down and tell you he needed a minute?

[MS. KELLY]: Absolutely, he had to. He couldn't function.

Further, Ms. Kelly testified that her father was coughing up phlegm and mucus. She stated: "I believe that he knew that that is what was happening, that the reason for his shortness of breath was because of his cigarette smoking."

Because of Christensen's progressive breathing difficulties and fatigue, he sought treatment from Dr. Alan Shorofsky on April 24, 1998. Dr. Shorofsky testified that he conducted a physical examination and "was concerned after the examination that [Christensen] might have early emphysema or chronic obstructive pulmonary disease" ("COPD"). Therefore, he ordered a chest X-ray and "general blood work that [Christensen] was due to get."

Christensen had the chest X-ray on April 27, 1998. It revealed a "5 × 8 mm nodule" in the left upper lobe of Christensen's lung, which was "not seen in 1995." [7]

According to Ms. Kelly, her parents told her that the X-ray showed a "suspicious spot" on her father's lung, "but nothing at that point was diagnosed on his lungs." Nevertheless, she

---

7. Appellees cite to page 349 of the Record Extract, the progress note of Dr. Shorofsky dated April 29, 1998, to support their assertion that Dr. Shorofsky informed Christensen about the lung mass on April 29, 1998. Our review of that progress note does not support the assertion. Nor did we locate elsewhere in the Record Extract the precise date when the X-ray results were communicated to Christensen.

said: "When I hear about a spot on a lung, I would assume it was cancer." The following deposition testimony is pertinent:

[QUESTION]: Did your dad ever tell you that, you know, he was, he had any concerns about the spot being cancer?

[MS. KELLY]: I think he was concerned that it was cancerous, yes.

[QUESTION]: And why do you say that?

[MS. KELLY]: Because I believe that if he thought he had a spot on his lungs that it wasn't just there, it was cancerous.

[QUESTION]: And, then in your mind, was that something that could have been caused by smoking?

\* \* \*

[MS. KELLY]: I related them, yes.

[QUESTION]: Do you know if your father also related them?

[MS. KELLY]: I believe he did.

At his deposition, Christensen described the medical testing he underwent between May and August of 1998:

During May, 1998, I had a physical examination and chest X-ray. I was informed by Dr. Bedon at the Greater Baltimore Medical Center that this testing showed that I had emphysema with a spot in my lung. In July of 1998 I underwent a sputum test and CT scan. On August 13, 1998 I underwent a cat scan guided needle biopsy performed by Dr. Cockey at Greater Baltimore Medical Center which established that the spot in my lung is cancer. Additional lymph node biopsies showed that my cancer is metastatic.

As indicated, Christensen's chest X-ray was "followed up" with a CAT scan (computed axial tomography) on May 6, 1998. It "revealed a 1.5 by 1.5 centimeter right paratracheal node and a 3.3 by 2.7 centimeter pleural based mass within the right lobe superior segment." Thus, while the chest X-ray found a "nodular problem" in the left upper lobe, the CAT scan "showed a mass in the right lobe." Dr. Shorofsky

discussed the results of the CAT scan with Mr. Christensen on or about May 6, 1998, but he (the doctor) did not recall the particulars of the discussion. The doctor noted that he "probably" told the Decedent that he "possibly" had lung cancer, and advised Christensen to see a "pulmonary specialist for further testing."

While Dr. Shorofksy "was very worried about cancer," he maintained that he would not have made those concerns known to Christensen. Conceding that he "would have been very surprised" if Christensen did not have cancer, the doctor added: "I've been surprised before." He also testified: "I point out to patients that until we really know, we don't know. So I try to give some hope that it might be something else, which sometimes it happens."

When questioned about his discussion of the CAT scan results with Christensen, Dr. Shorofsky stated:

What I recall again is when I get the results of the CAT scan like that, when I get a result of a chest X-ray that shows something, I talk to the patient, saying that listen, the chest X-ray showed something. You got to understand an X-ray is just a confluence of shadows. There might be something there, there might not be something there. We've got to do more specific tests.

When I got the results of the CAT scan I probably told him well, there is something specific there and we really have to look into it further, and that's why I'm sending you to the pulmonary specialist. But again, the way I usually do it is to raise the, bring up—if they don't bring up cancer I bring up cancer because they're thinking about cancer, and *I try to let them know until we actually have a definitive diagnosis you don't know what it is.*

(Emphasis added).

Ms. Christensen testified about her discussions with her husband after he learned the results of the CAT scan in May 1998:

[QUESTION]: And what were you informed the results of the CAT scan showed?

[MS. CHRISTENSEN]: That there was something in his lung.

* * *

[QUESTION]: So this was related to you by Mr. Christensen?

[MS. CHRISTENSEN]: Yes.

[QUESTION]: And did he tell you what the, if there was a concern as to what it was that the CAT scan showed in his lung?

[MS. CHRISTENSEN]: Yes.

[QUESTION]: And what did he say?

[MS. CHRISTENSEN]: That it was cancer.

[QUESTION]: *And that at that time when he got the results from the CAT scan, was it also the thought that this would be a cancer related to his cigarette smoking?*

* * *

[MS. CHRISTENSEN]: *At the time they said that it was cancer[,] I would not have at that moment said it was related to smoking.*

[QUESTION]: Why not?

[MS. CHRISTENSEN]: Because the word cancer is just enough to throw you that you don't think about all the ramifications of that at that particular moment in time.

[QUESTION]: Did you discuss with Mr. Christensen when the CAT scan was performed, when the results came in, whether he believed at that time that the cancer was caused by the cigarette smoke?

[APPELLANT'S COUNSEL]: Objection. If you can answer it.

[MS. CHRISTENSEN]: Here again, I think the trauma of knowing that it was cancer, that *neither one of us stood there and said that's because he had smoked.*

[QUESTION]: At some point in time thereafter—

[MS. CHRISTENSEN]: Yes.

[QUESTION ]:—when you would—

[MS. CHRISTENSEN]: Very shortly after.

(Emphasis added).

Christensen was referred to Dr. George A. Bedon, a pulmonary specialist, for further evaluation. He met with Dr. Bedon on June 15, 1998. Dr. Bedon's "Initial Consultation Note," dated June 15, 1998, describes Christensen's "HISTORY OF PRESENT ILLNESS." Dr. Bedon also described his "IMPRESSION" of Christensen, noting that Christensen was to "undergo some sputum tests for cytology as well as acid fast bacilli and routine cultures." Regarding the mass revealed in the CAT scan, Dr. Bedon stated that Christensen would undergo a "needle biopsy" or "repeat the CAT scan in four to six months."

The following deposition testimony of Dr. Bedon is pertinent:

[QUESTION]: Okay. When you first met with Mr. Christensen, Dr. Bedon, did you discuss this CT with Mr. Christensen?

[DR. BEDON]: Yes.

[QUESTION]: What, if anything, did you tell him about it?

[DR. BEDON]: Basically what is described in my note. Here is a man that is an ex-smoker, he has positive PPD and he has new manifestations of the pulmonary symptoms—cough and shortness of breath—and the basic thing is—and he was telling me also that, you know, these shadows, et cetera, they were there before. *And so was all this again, is this TB or is this a cancer, and we need to, you know, find out what this all about.*

We discussed, you know, all the—so he knew about it, you know, that. The CAT scan, incidentally, was there during the visit. I usually when I see the patient I see them with the CAT scan there, and I usually go over with the patient, I show them. So he knew that, you know, that was the situation, essentially. *And we discussed on how to find out, you know, what is all about it.* Basically, just the outline was the major thing.

The simplest way to start with analyze the sputum. He's bringing up so much there. Number two, are these changes new or old? And I have to respect him because he was telling me that, you know, he was there before, he had some abnormalities, density, this is what he was telling me. *And then the third was that if we didn't know, then a biopsy tissue diagnosis needed to be done.*

[QUESTION]: Based on the size of the pleural mass, the 3.3 by 2.7, and the fact that there was the paratracheal involvement, *did this appear to be cancer to you?*

[DR. BEDON]: *Yes. Yes.*

[QUESTION]: *And you discussed that with Mr. Christensen?*

[DR. BEDON]: *Yes.*

(Emphasis added).

The sputum cytology test was performed on July 29, 1998. The lab results indicated the presence of "atypical glandular cells [, which were] highly suspicious for adeno-carcinoma."

At his deposition, Christensen stated that he learned in July 1998 that he had lung cancer:

[QUESTION]: When did you find out that you had lung cancer?

[MR. CHRISTENSEN]: I found out in the latter part of July [1998].

And as a result of a meeting with a Dr. Bedon who is a pulmonary specialist, and as a result of some sputum tests, it was determined that I had cancer.

I then, to further things along, I had a needle biopsy on my lung where it was also determined that the tumor was malignant.

Moreover, in his affidavit, Christensen averred:

During July, 1998, my doctors told me that I had no more than 14 months to live. My terminal prognosis was confirmed by doctors after courses of chemotherapy and radiation therapy.

I believe that my lung cancer and emphysema were caused by years of cigarette smoking. . . .

\* \* \*

It was very difficult for me to quit smoking. I believe I became addicted to cigarette smoke. From the 1940's to the present I have always felt and to this day, still feel the urge to smoke. . . .

Dr. Bedon met with Christensen on or about August 5, 1998, to discuss the results of the sputum cytology. He indicated to Christiansen that further testing was needed. The following deposition colloquy is relevant:

[QUESTION]: Did you discuss this report with Mr. Christensen?

[DR. BEDON]: Oh, yes. Definitely. Oh, yes.

[QUESTION]: Based on this and what you learned from the CT what did you tell him?

[DR. BEDON]: *That we needed to have a biopsy to have it 100 percent.*

[QUESTION]: *But in your view this clearly was cancer?*

[DR. BEDON]: *Yes.*

[QUESTION]: *And you discussed that with Mr. Christensen?*

[DR. BEDON]: *Yes, I did.*

(Emphasis added).

Dr. Bedon maintained, however, that he would not have discussed the *cause* of the Decedent's cancer until he received a definitive pathologic report confirming the presence of a cancer and an identification of the cancer's cell type. According to Dr. Bedon, he did not inform Christensen or his wife that the cancer was caused by cigarette smoking until after Christensen underwent a needle biopsy on August 13, 1998; that procedure established that the lung cancer was, indeed, caused by cigarette smoking.

It was not until September 1998 that Dr. Bedon met with Christensen to discuss the results of the needle biopsy.[8] According to appellants, "[i]t was at that meeting that Dr. Bedon for the first time connected Mr. Christensen's lung cancer with his previous smoking history." The following deposition testimony of Dr. Bedon is pertinent:

[QUESTION]: So you, to make sure I understand your answer, you would have related his cancer to his smoking?

[DR. BEDON]: Yes. As part of the type of the cells and all that, yes.

[QUESTION]: *You would have discussed that with Mr. and Mrs. Christensen?*

[DR. BEDON]: *Yes.*

[QUESTION]: *Both in the initial meeting in June as well as when—*

[DR. BEDON]: *Once we had the biopsy. Once we have the true tissue diagnosis—and that was in, is that September?* Well, let's see.

\* \* \*

So he had the biopsy.... It was in August [of 1998]. Then he had all the studies done. Okay. So—and then he was seen in September. *So that is when we discussed that, in September* [of 1998].

[QUESTION]: *I believe you testified, didn't you, Dr. Bedon, that you all talked [in August 1998] about cancer when you got the sputum cytology results?*

[DR. BEDON]: Yes, we did.

[QUESTION]: *At that time did you relate Mr. Christensen's condition to his cigarette smoking?*

[DR. BEDON]: *I did not talk about that at that point, no. When he got the sputum test, no, I did not talk about that.*

---

**8.** The Medical Cytology Result Report, dated August 13, 1998, reflects a diagnosis of "Positive for malignancy," and "Pt. aware." However, it does not specify that the patient was aware of the *cause* of the malignancy.

*It was at the time of the biopsy. At the time of the meeting in September,* sometime around, you know, when we got together.

[QUESTION]: Do you recall, Dr. Bedon, when you met with Mr. and Mrs. Christensen when you received the sputum cytology, did they mention the cigarette smoking?

[DR. BEDON]: I don't remember that.

(Emphasis added).

Subsequent lymph node biopsies performed in September 1998 by Dr. Paul M. Leand, a thoracic surgeon, showed that Mr. Christensen's lung cancer was metastatic. As we indicated, Mr. Christensen died on January 17, 2001.

The court held a motion hearing on November 12, 2003. Thereafter, on November 19, 2003, the court issued an Opinion and Order granting appellees' summary judgment motion as to all claims.

In its ruling concerning the survival claims, the court applied the "discovery rule" with respect to the statute of limitations. It found that the "undisputed facts" supported the conclusion that "[t]he conditions necessary to place Mr. Christensen on inquiry, if not actual, notice of a potential claim against [appellees] existed more than three years before Mrs. Christensen filed suit." The court pointed out that, between July 29 and August 5, 1998, the Decedent was told that he "clearly had cancer." Of significance here, the court also determined that the Decedent "immediately attributed his lung cancer to smoking." Moreover, the court was of the view that Christensen "had every reason to suspect, and did suspect, as early as the spring of 1998 that he may have been injured by cigarettes." In this regard, the court noted that the Decedent was "fully aware" of the "association between cigarette smoking and lung cancer" by January 1976.

The court said:

The period of limitations on filing suit is not delayed (or tolled) until the conclusion of an investigation or, as here, pending a conclusive diagnosis or opinion as to the cause of

the injury or illness.... Of course, this clearly means that a person who suspects wrongdoing must file suit within the time of the statute of limitations. Inquiry notice exists when the facts and circumstances would have caused a reasonable person in the plaintiffs' position to investigate in such a manner so that the investigation, if pursued with reasonable diligence, would have revealed the alleged claim. *Pennwalt Corp., supra,* 314 Md. at 448–49, 550 A.2d at 1163.

In cases involving medical illness, Maryland courts have held that a plaintiff is on inquiry notice, and the statute of limitations begins to run, when the plaintiff has knowledge that he may have been harmed....

Further, the court reasoned:

As these undisputed facts show, Mr. Christensen was on inquiry notice more than three years before the lawsuit was filed. He understood for more than 20 years that cigarettes could cause him harm, including lung cancer. More than three years before the suit was filed, Mr. Christensen had been told by his physician, and believed, that he had lung cancer, which he attributed to smoking. Indeed, both he and his physicians began to suspect he might have cancer in the Spring of 1998 based on Mr. Christensen's chronic shortness of breath, difficulty engaging in normal activities such as walking across the back yard, and his continued and progressive abnormal test results. Based on these and the other facts in Mr. Christensen's possession as of that time, ... an objectively reasonable person would have been prompted to investigate further, which Mr. Christensen did.

The court also determined that appellants' wrongful death claims were barred by limitations. Noting that such a claim is derivative in nature, it reasoned that if Christensen's individual claims were time-barred, the wrongful death claims were also barred. The court explained:

[C]ourts have long recognized that a wrongful death claim in Maryland is a derivative [action] and that the decedent's claims must have been viable, had he survived, in order for a beneficiary to bring a wrongful death claim....

> Any ground that would bar a direct claim by a decedent thus bars a wrongful death claim brought by the decedent's statutory beneficiaries. . . .
>
> This includes the bar of the statute of limitations. . . . Thus, if a decedent's claim against a particular defendant would be time-barred, the alleged wrongful conduct underlying that claim cannot constitute a "wrongful act" that would support a claim under the Wrongful Death Act.
>
> That is the case here. Mr. Christensen would not have been entitled to maintain an action and recover damages as of the date the Complaint was filed, had he not died, because his claims were time-barred. As a matter of law, therefore Plaintiffs cannot establish the requisite "wrongful act" required by the plain language of the Wrongful Death Act and summary judgment is proper.

In addition, the court noted that Maryland law does not recognize equitable tolling of the statute of limitations during the pendency of a class action. It said:

> Statutes of limitations are strictly construed and any exceptions to them must be created by the Maryland legislature. Since the Maryland legislature has not spoken on this precise matter, the Maryland three-year statute of limitations is not tolled because the plaintiffs' decedent had previously joined a class action suit.

On December 2, 2003, the circuit court issued an "Order Directing Entry of Judgment in Favor of Defendants." This appeal followed.

## DISCUSSION

### I.

█ Appellants contend that limitations was tolled during the pendency of the *Richardson* class action suit, which was filed in May of 1996 and decertified in a ruling issued by the Court of Appeals in May of 2000. While recognizing that no Maryland appellate case specifically recognizes the doctrine of

equitable class action tolling,[9] as announced in *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) and its progeny, appellants nevertheless urge us to adopt the doctrine of class action tolling in the context of this case. If limitations was tolled during the pendency of the *Richardson* class action litigation, then appellants' suit was timely filed.

Appellees counter that because Maryland has not recognized class action tolling, and the federal class action tolling doctrine is "not controlling authority" here. In urging us to reject appellants' position, appellees point out that the judicial creation of exceptions to statutes of limitations is "directly contrary to Maryland law," and they remind us that the Maryland appellate courts have "consistently refused requests to create equitable tolling for statutes of limitations where no legislative enactment has permitted such tolling." Appellees also maintain that, because Giant was not a defendant in *Richardson*, tolling would not apply in any event to any claims asserted against Giant.

Maryland's class action mechanism is found in Maryland Rule 2–231.[10] Our rule is almost identical to Rule 23 of the

---

**9.** The term "tolling" means that, "during the relevant period, the statute of limitations ceases to run." *Chardon v. Soto*, 462 U.S. 650, 652 n. 1, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983).

**10.** Rule 2–231 provides, in part:

**Rule 2–231. Class actions.**
(a) **Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
(b) **Class actions maintainable.** Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of

Federal Rules of Civil Procedure ("FRCP"), from which it derives. *See* Source note to Rule 2–231 (noting that the Maryland rule "is derived from the 1966 version of Fed. R.Civ.P. 23," in whole or in part).[11]

■ The "primary purpose" of the class action rule "is to overcome the impracticalities of overtly cumbersome joinder requirements." *Kirkpatrick v. Gilchrist,* 56 Md.App. 242, 249, 467 A.2d 562 (1983). Moreover, the rule "helps to promote the objectives of judicial economy and access to the legal system, particularly for persons with small individual claims." *Philip Morris, Inc.,* 358 Md. at 732, 752 A.2d 200. As the Supreme Court recognized in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 617–18, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997):

> [C]lass-action practice has become ever more "adventuresome" as a means of coping with claims too numerous to secure their "just, speedy, and inexpensive determination"

---

(A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . .

(c) **Certification.** On motion of any party or on the court's own initiative, the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action. . . .

11. Subsections (a) and (b) of each rule, "Prerequisites to a class action" and "Class actions maintainable," are substantially identical in content. Subsection (c) of the Maryland Rule, "Certification," and subsection (c)(1) of the federal rule, "Determination by Order Whether Class Action to be Maintained," are also substantially identical. Subsection (d) of the Maryland Rule, "Partial class actions; subclasses," mirrors subsection (c)(4) of the federal rule. Subsection (e) of the Maryland Rule, "Notice," corresponds to subsection (c)(2) of the federal rule. Subsection (f) of the Maryland Rule, "Orders in conduct of actions," tracks subsection (d) of the federal rule, "Orders in Conduct of Actions." Subsection (g) of the Maryland Rule, "Discovery," does not have a counterpart in the federal rule. Subsection (h) of the Maryland Rule, "Dismissal or compromise," is substantially the same as subsection (e) of the Federal Rule, "Dismissal or Compromise." Finally, subsection (i) of the Maryland Rule, "Judgment," replicates subsection (c)(3) of the Federal Rule.

one by one. See Fed. Rule Civ. Proc. 1. The development reflects concerns about the efficient use of court resources and the conservation of funds to compensate claimants who do not line up early in a litigation queue.

The class action tolling doctrine effectuates the goals of the class action rule, because it fosters the efficiency and economy of litigation. In analyzing the concept of class action tolling, however, we must also keep in mind the purpose for which statutes of limitations are enacted.

In general, statutes of limitations represent a legislative policy determination of an appropriate and reasonable time for a person of ordinary diligence to initiate a legal action. *See Pennwalt Corp. v. Nasios,* 314 Md. 433, 437, 550 A.2d 1155 (1988); *Goldstein v. Potomac Elec. Power Co.,* 285 Md. 673, 684, 404 A.2d 1064 (1979). These statutes "are designed to balance the competing interests of each of the potential parties as well as the societal interests involved." *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020 (1983). For example, statutes of limitations "assure fairness to a potential defendant by providing a certain degree of repose." *Id.* They also provide a degree of certainty to defendants by limiting a plaintiff's ability to file stale claims, thereby reducing the inconvenience and hazards associated with delay, such as lost evidence, failed memory, unavailable witnesses, and the difficulty in planning for the future because of "the uncertainty inherent in potential liability." *Id.; see Pennwalt,* 314 Md. at 437–38, 550 A.2d 1155. Plaintiffs, too, are served by such statutes, because they generally assure potential litigants adequate time to bring their claims, so long as they act with reasonable diligence. *Pennwalt,* 314 Md. at 437–38, 550 A.2d 1155; *Pierce,* 296 at 665, 464 A.2d 1020. In addition, statutes of limitations "serve society by promoting judicial economy." *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 333, 635 A.2d 394 (1994); *see Pennwalt,* 314 Md. at 437–38, 550 A.2d 1155; *Goldstein,* 285 Md. at 684, 404 A.2d 1064.

Quoting *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945), the Court of Appeals

explained in *Walko Corporation v. Burger Systems, Inc.,* 281 Md. 207, 210, 378 A.2d 1100 (1977):

> "Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.... (citation omitted). They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate."

The applicable statute of limitations for this case is found in § 5–101 of the Courts & Judicial Proceedings Article ("C.J.") of the Maryland Code (1974, 2002 Repl.Vol.). It states: "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Additional sections of the Code set forth alternative statutes of limitations for specified actions.[12] The Code also provides for tolling under certain circumstances. *See, e.g.,* C.J. § 5–201 (persons under a disability); C.J. § 5–202 (time between debtor's insolvency petition and dismissal of petition); C.J. § 5–205 (absence from State or moving from county).

To be sure, tolling of limitations for class representatives or class members is not specifically mentioned. However, when, as here, a Maryland procedural or evidentiary rule is derived from, and closely mirrors, a federal rule, our appellate courts have looked to federal law to interpret the corresponding Maryland rule. In *Jackson v. State,* 340 Md. 705, 716, 668 A.2d 8 (1995), for example, the Court of Appeals remarked

---

12. *See, e.g.,* C.J. § 5–102 (twelve year limitation for "specialties" actions); C.J. § 5–103 (twenty year limitation for adverse possession); C.J. § 5–104 (five year limitation for action on public officer's bond); C.J. § 5–105 (one year limitation for assault, libel, and slander actions).

that when a Maryland evidentiary rule has a counterpart in the federal rules, it is proper to "look to federal cases interpreting the federal rule for guidance in interpreting" the Maryland Rule. *See also Garay v. Overholtzer,* 332 Md. 339, 355, 631 A.2d 429 (1993) (noting that when a Maryland rule of procedure derives from a federal rule, "interpretations of that federal rule are persuasive as to the meaning and proper applications of the Maryland rule"); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 738 n. 8, 625 A.2d 1005 (1993) (observing that, "[b]ecause the Maryland summary judgment rule is derived from the federal rule, judicial interpretations of the federal rule are persuasive as to the meaning and proper application of the Maryland rule").

In *Snowden v. Balt. Gas & Elec. Co.,* 300 Md. 555, 562, 479 A.2d 1329 (1984), the Court of Appeals considered whether an order denying class certification constituted a final judgment for purposes of appeal. In its analysis, the Court found "instructive" the Supreme Court's opinion in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). Relying on that decision and other federal appellate decisions, the Court of Appeals concluded that an order denying class certification is not immediately appealable. *See also Pollokoff v. Md. Nat'l Bank,* 288 Md. 485, 491–94, 418 A.2d 1201 (1980)(analyzing Md. Rule 209, the predecessor to our current class action rule, and referring to the Supreme Court's interpretation of FRCP 23); *Johnson v. Chrysler Credit Corp.,* 26 Md.App. 122, 337 A.2d 210 (1975) (looking to the Supreme Court's opinion in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), to aid in our interpretation of Md. Rule 209).

More recently, the Court of Appeals remarked in the *Richardson* class action case that "[t]here [was] a dearth of authority in Maryland analyzing the specific requirements" of Md. Rule 2–231. *Philip Morris,* 358 Md. at 724, 752 A.2d 200. Yet, the Court acknowledged that "there exists an abundance of cases from other jurisdictions, federal and state, that have analyzed class action rules either identical to or similar to Maryland's rule." *Id.* Of significance here, the Court specifi-

cally drew on those federal and state cases to "aid [its] analysis in determining whether" the circuit court "applied the correct legal standards in reaching its decision" with respect to class certification. *Id.* at 726, 752 A.2d 200. In reaching its conclusion that the circuit court erred with regard to class certification, the Court took into account an "almost unanimous reluctance" of a "myriad of federal and state courts" to certify class actions for mass tort tobacco litigation. *Id.* at 729, 752 A.2d 200.

Because the Court of Appeals in *Richardson* looked for guidance to the federal courts and other state courts with comparable class action rules to analyze the propriety of the class certification, we believe it is also appropriate for this Court to review the "abundance" of cases from other courts that have considered class action tolling. These cases guide our analysis.

In 1974, the Supreme Court first considered the issue of equitable tolling in class action suits brought under FRCP Rule 23. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), involved a federal antitrust action brought by the State of Utah on behalf of itself and other public agencies. The suit was filed eleven days before the applicable statute of limitations was to expire. During the course of the litigation, the federal district court ruled that the suit could not proceed as a class action. Eight days after the trial court denied class certification, numerous Utah towns, municipalities, and water-and-sewer districts moved to intervene in the suit. *Id.* at 543–44, 94 S.Ct. 756. Ruling that limitations had expired, the district court denied the motion. *Id.* at 544, 94 S.Ct. 756.

The Supreme Court disagreed, concluding that the motions to intervene were not time-barred. It reasoned that unless the filing of a class action tolled limitations, potential class members would be induced to file motions to intervene or to join in the suit, merely to protect themselves in the event of the denial of class certification. *Am. Pipe*, 414 U.S. at 553, 94 S.Ct. 756. In its view, such a result would thwart two key

goals of the class action procedure: promotion of efficiency and economy of litigation. *Id.* Therefore, to protect the policies undergirding the class action procedure, the Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id.* at 554, 94 S.Ct. 756.

Writing for the majority, Justice Stewart said:

Under present Rule 23 ... the difficulties and potential for unfairness which, in part, convinced some courts to require individualized satisfaction of the statute of limitations by each member of the class, have been eliminated, and there remain no conceptual or practical obstacles in the path of holding that the filing of a timely class action complaint commences the action for all members of the class as subsequently determined.[ ] Whatever the merit in the conclusion that one seeking to join a class after the running of the statutory period asserts a "separate cause of action" which must individually meet the timeliness requirements, such a concept is simply inconsistent with Rule 23 as presently drafted. *A federal class action is no longer "an invitation to joinder" but a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.* Under the circumstances of this case, where the District Court found that the named plaintiffs asserted claims that were "typical of the claims or defenses of the class" and would "fairly and adequately protect the interests of the class," Rule 23(a)(3),(4), the claimed members of the class stood as parties to the suit until and unless they received notice thereof and chose not to continue. *Thus, the commencement of the action satisfied the purpose of the limitation provision as to all those who might subsequently participate in the suit as well as for the named plaintiffs. To hold to the contrary would frustrate the principal function of a class suit, because then the sole means by which members of the class could assure their participation in the judg-*

*ment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties-precisely the multiplicity of activity which Rule 23 was designed to avoid* in those cases where a class action is found "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). *Id.* at 550–51, 94 S.Ct. 756 (emphasis added) (some citations omitted).

Further, the Supreme Court said:

We hold that in this posture, at least where class action status has been denied solely because of failure to demonstrate that "the class is so numerous that joinder of all members is impracticable," *the commencement of the original class suit tolls the running of the statute for all purported members of the class* who make timely motions to intervene after the court has found the suit inappropriate for class action status. . . .

*A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure.* . . .

*Id.* at 552–53, 94 S.Ct. 756 (emphasis added).

In the Court's view, the result was "in no way inconsistent with the functional operation of a statute of limitations." *Id.* at 554, 94 S.Ct. 756. It reasoned: "Since the imposition of a time bar would not in this circumstance promote the purposes of the statute of limitations, the tolling rule we establish here is consistent both with the procedures of Rule 23 and with the proper function of the limitations statute." *Id.* at 555, 94 S.Ct. 756. Moreover, the Court expressly rejected the contention that limitations is the sole prerogative of Congress, because it constitutes a " 'substantive' element" of a claim. *Id.* at 556, 94 S.Ct. 756. To the contrary, it concluded that "the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not

restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose." *Id.* at 559, 94 S.Ct. 756. Accord *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176 n. 13, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (recognizing that *American Pipe* "established that commencement of a class action tolls the applicable statute of limitations as to all members of the class").

In *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), decided nine years later, Parker claimed that his employer discriminated against him on the basis of race, in violation of Title VII. He procured a "right to sue" letter from the Equal Employment Opportunity Commission ("EEOC"). While Parker's complaint was pending before the EEOC, other former employees initiated a class action against the employer, claiming discrimination. Parker subsequently filed an action in federal court, within ninety days of the date that class certification was denied, but two years after obtaining his "right to sue" letter. *Id.* at 347–48, 103 S.Ct. 2392. The employer argued that *American Pipe* was limited to intervenors, and did not toll limitations for class members who filed their own actions. The district court awarded summary judgment to the employer, ruling that Parker had failed to file his suit within ninety days of receiving his "right to sue" letter, as required under Title VII. *Id.* at 348, 103 S.Ct. 2392.

The Supreme Court considered whether the filing of a class action tolls the applicable statute of limitations, so as to permit "all members of the putative class to file individual actions in the event that class certification is denied," so long as it is accomplished within the time that remained on the limitations period. *Id.* at 346–47, 103 S.Ct. 2392. Relying on *American Pipe,* it ruled that Parker's suit was timely. *Id.* at 351–52, 103 S.Ct. 2392. The Court said: "While *American Pipe* concerned only intervenors, we conclude that the holding of that case is not to be read so narrowly. The filing of a class action tolls the statute of limitations 'as to all asserted members of

the class,' not just as to intervenors." *Id.* at 350, 103 S.Ct. 2392 (citation omitted).

In reaching its conclusion, the Supreme Court underscored the role of class action tolling in facilitating the important objectives of FRCP 23. It said, *id.* at 350–51, 103 S.Ct. 2392:

A putative class member who fears that class certification may be denied would have every incentive to file a separate action prior to the expiration of his own period of limitations. The result would be a needless multiplicity of actions—precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid.

Further, the Court reasoned that a tolling rule does not frustrate the objectives of statutes of limitations, stating:

The Court noted in *American Pipe* that a tolling rule for class actions is not inconsistent with the purposes served by statutes of limitations. 414 U.S. at 554, 94 S.Ct. 756. Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights, but these ends are met when a class action is commenced. Class members who do not file suit while the class action is pending cannot be accused of sleeping on their rights; Rule 23 both permits and encourages class members to rely on the named plaintiffs to press their claims. And a class complaint notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. The defendant will be aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification.

*Id.* at 352–53, 103 S.Ct. 2392 (internal quotations and some citations omitted).

The Supreme Court concluded, *id.* at 353–54, 103 S.Ct. 2392:

We conclude, as did the Court in *American Pipe,* that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554, 94 S.Ct. 756. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action.

In this case, respondent clearly would have been a party in *Pendleton* if that suit had been permitted to continue as a class action. The filing of the *Pendleton* action thus tolled the statute of limitations for respondent and other members of the *Pendleton* class. Since respondent did not receive his Notice of Right to Sue until after the *Pendleton* action was filed, he retained a full 90 days in which to bring suit after class certification was denied. Respondent's suit was thus timely filed.

One week after *Crown,* the Supreme Court decided *Chardon v. Soto,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). In that case, school employees filed a class action against Puerto Rican school officials, asserting claims under 42 U.S.C. § 1983 based on their demotions for alleged political reasons. *Id.* at 651–52, 103 S.Ct. 2611. The class action was filed shortly before the expiration of the one-year statute of limitations applicable under Puerto Rican law. *Id.* at 651, 654, 103 S.Ct. 2611.[13] After the district court denied class certification, on the ground that the proposed class was not sufficiently numerous to qualify under FRCP 23, the school employees filed individual § 1983 actions in federal court. *Id.* at 652–53, 103 S.Ct. 2611. Those suits, however, were filed more than one year after the claims accrued, "even excluding the period during which the class action was pending, but less than one

---

13. Section 1983 actions filed in state courts are governed by state statutes of limitations and rules regarding tolling, unless those rules are inconsistent with federal law. *Id.* at 655–56, 660, 103 S.Ct. 2611.

year after the denial of class certification." *Id.* at 653, 103 S.Ct. 2611. Accordingly, if limitations was merely suspended during the pendency of the class action, the suits were time-barred. On the other hand, if limitations "began to run anew" after the class certification was denied, the suits were timely. *Id.*

The federal appeals court looked to Puerto Rican law to resolve the tolling issue, because of the absence of a federal statute of limitations for § 1983 claims. *Id.* at 654, 103 S.Ct. 2611. It concluded that, under Puerto Rican law, the statute of limitations began to run anew when the tolling ceased upon denial of class certification. Therefore, it ruled that the actions were timely filed. The Supreme Court agreed, stating, *id.* at 661–62, 103 S.Ct. 2611:

> In a § 1983 action ... Congress has specifically directed the courts, in the absence of controlling federal law, to apply state statutes of limitations and state tolling rules unless they are "inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988. *American Pipe* does not answer the question whether, in a § 1983 case in which the filing of a class action has tolled the statute of limitations until class certification is denied, the tolling effect is suspension rather than renewal or extension of the period. *American Pipe* simply asserts a federal interest in assuring the efficiency and economy of the class action procedure. After class certification is denied, that federal interest is vindicated as long as each unnamed plaintiff is given as much time to intervene or file a separate action [] as he would have under a state savings statute applicable to a party whose action has been dismissed for reasons unrelated to the merits, or, in the absence of a statute, the time provided under the most closely analogous state tolling statute.
>
> .... The Court of Appeals applied the Puerto Rican rule that, after tolling comes to an end, the statute of limitations begins to run anew. Since the application of this state law rule gives unnamed class members the same protection as if they had filed actions in their own names which were

subsequently dismissed, the federal interest set forth in *American Pipe* is fully protected.[11]

The Court of Appeals correctly rejected the argument that *American Pipe* establishes a uniform federal rule of decision that mandates suspension rather than renewal whenever a federal class action tolls a statute of limitations.

Our research reveals that numerous state courts have adopted the concept of class action tolling, as articulated in *American Pipe* and its progeny. For example, in *First Baptist Church of Citronelle v. Citronelle–Mobile Gathering, Inc.,* 409 So.2d 727, 728 (Ala.1981), the court held that, "when the interests of putative class members may not be adequately protected by the class representative or by the judiciary, the statute of limitations is tolled from the date of commencement of the action until the date of denial of class certification." The Alabama court was persuaded by *American Pipe,* noting that "Rule 23 of the Alabama Rules of Civil Procedure is identical to Rule 23 of the Federal Rules of Civil Procedure." *Id.* at 729. It reasoned:

> The principal function of the class action—to avoid multiplicity in filing suits, motions and papers—will be defeated if the statute of limitations is not tolled in favor of the plaintiffs. A putative class member could protect his or her interests only by filing an individual action or intervening before the statute of limitations runs. *Filing of individual actions in such a case as the case before the Court is precisely what Rule 23 was designed to avoid.*

*Id.* (emphasis added) (citations omitted).

Similarly, in *Levi v. Univ. of Hawaii,* 67 Haw. 90, 679 P.2d 129 (Haw.1984), the Supreme Court of Hawaii stated:

> One of the purposes of a class action suit is to prevent multiplicity of actions, thereby preserving the economies of time, effort and expense. This objective can be effectively achieved only by allowing the proposed members of a class to rely on the existence of a suit which protects their rights. We therefore adopt the rule enunciated in *[American Pipe],* and clarified in *[Crown]* which states that the commence-

ment of a class action suspends the applicable statute of limitations as to all asserted members of a class who would have been parties had the suit continued as a class action. To hold otherwise would be to encourage intervention and filings of separate actions in the event class certification might be denied, thus creating the multiplicity of actions that class suits were designed to avoid.

*Id.* at 132 (citations omitted).

Numerous other courts have reached similar conclusions. *See, e.g., Nolan v. Sea Airmotive, Inc.,* 627 P.2d 1035, 1041–42 (Alaska 1981) (finding the Supreme Court's rationale in *American Pipe* "persuasive," and holding that Alaska class action rule "tolls the statute of limitations as to all members of the class, whether or not named in the complaint"); *Blaylock v. Shearson Lehman Brothers, Inc.,* 330 Ark. 620, 954 S.W.2d 939, 941 (1997) (citing *American Pipe* and holding that "the commencement of a class action tolls the running of the statute [of limitations] as to purported members of the class during the pendency of the litigation"); *S.F. Unified Sch. Dist. v. W.R. Grace & Co.,* 37 Cal.App.4th 1318, 44 Cal.Rptr.2d 305, 317–18 (1995) (determining that limitations period was tolled when school district was a party to a federal class action against asbestos manufacturers); *Rosenthal v. Dean Witter Reynolds, Inc.,* 883 P.2d 522, 531 (Colo.Ct.App.1994) ("The commencement of a class action tolls the statute of limitations for all members of the putative class, thereby preserving for the individual class members the portion of the limitations period that remained at the time the class action was commenced"), *aff'd in part, rev'd in part on other grounds,* 908 P.2d 1095 (Colo.1995); *Campbell v. New Milford Bd. of Educ.,* 36 Conn.Supp. 357, 423 A.2d 900, 905 n. 6 (1980) (noting that in class action lawsuits "the statute [of limitations] is tolled from the time the complaint was filed until the decision on class certification is made"); *Pope v. Intermountain Gas Co.,* 103 Idaho 217, 646 P.2d 988, 1010 n. 28 (Idaho 1982) (citing *American Pipe* to support the court's determination that the statute of limitations for class action members' claims was tolled during the pendency of the class action); *Munsterman*

*v. Ill. Agric. Auditing Ass'n,* 106 Ill.App.3d 237, 62 Ill.Dec. 125, 435 N.E.2d 923, 925–26 (1982) (citing *American Pipe* and agreeing that the plaintiff's action was tolled during the pendency of a class action; the statute of limitations clock restarted when the class action was dismissed); *Arnold v. Dirrim,* 398 N.E.2d 426, 439–40 (Ind.Ct.App.1979) (citing *American Pipe* and determining that filing of amended complaint, which sought to bring class action, constituted filing by all persons subsequently found to be class members, so that certain class members were not barred by statute of limitations); *Lucas v. Pioneer, Inc.,* 256 N.W.2d 167, 180 (Iowa 1977) (holding that "claims of parties properly members of the class, who timely intervene in the proceedings below . . . ., shall be deemed brought, for limitation purposes, when the appropriate defendant was legally served in the original litigation"); *Waltrip v. Sidwell Corp.,* 234 Kan. 1059, 678 P.2d 128, 133 (1984) (holding that "the right of all putative members of a proposed class in an action filed pursuant to [Kansas's class action rule of civil procedure] to file a separate action is preserved pending the determination of whether the initial case shall be maintained as a class action"); *Warren Consol. Sch. v. W.R. Grace & Co.,* 205 Mich.App. 580, 518 N.W.2d 508, 511 (1994) ("Where class certification is later denied, the commencement of a class action suspends the applicable period of limitation with respect to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"); *Carlson v. Indep. Sch. Dist. No. 283,* 370 N.W.2d 51, 55 (Minn.Ct.App.1985) (citing *American Pipe* and explaining that "[c]ase law is clear that tolling starts with the filing of the action and continues until certification of the class"); *Hyatt Corp. v. Occidental Fire & Cas. Co. of N.C.,* 801 S.W.2d 382, 389 (Mo.Ct.App.1990) (determining that class action complaints "tolled the statute of limitations on behalf of *all* putative [firefighters], including those who subsequently filed their own actions or settled individual claims during the pendency of" a preexisting class action); *White v. Violent Crimes Comp. Bd.,* 76 N.J. 368, 388 A.2d 206, 211 (1978) (citing *American Pipe* and holding that, "in the case of

a statutorily created right, a 'substantive' limitation period may appropriately be tolled in a particular set of circumstances if the legislative purpose underlying the statutory scheme will thereby by effectuated"); *Yollin v. Holland Am. Cruises, Inc.*, 97 A.D.2d 720, 468 N.Y.S.2d 873, 875 (N.Y.App. Div.1983) (citing *American Pipe* and holding that "the timely commencement of the action by plaintiff ... satisfied the purpose of the contractual limitation period as to all persons who might subsequently participate in the suit as members of a class"); *Bergquist v. Int'l Realty, Ltd.*, 272 Or. 416, 537 P.2d 553, 561 (1975) (adopting the rule set forth in *American Pipe* ); *Mun. Auth. of Westmoreland County v. Moffat*, 670 A.2d 747, 749 (Pa.Cmwlth.Ct.1996) (citing *American Pipe* and concluding that limitations was tolled "during the pendency of the class action"); *Bara v. Major Funding Corp. Liquidating Trust*, 876 S.W.2d 469, 472–73 (Tex.Ct.App.1994) (holding that where state attorney general files suit "on behalf of a specified group of individuals, that suit qualifies as a *de facto* class action and the statute of limitations is tolled during the period in which the individuals are participants in the attorney general's suit"); *Am. Tierra Corp. v. City of W. Jordan*, 840 P.2d 757, 762 (Utah 1992) (adopting class action tolling "to avoid duplication of litigation, promote justice, do equity, and generally further the judicial efficiency and economy that class actions are designed to promote").

Many federal court decisions are also persuasive. *See, e.g., Appleton Elec. Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 608 (7th Cir.1980) (recognizing that achieving litigation efficiency, which FRCP 23 was designed to effectuate, "transcends the policies of repose and certainty behind statutes of limitations"), *cert. denied,* 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981); *Rose v. Ark. Valley Environ. & Util. Auth.*, 562 F.Supp. 1180, 1192 (1983) (recognizing that "the appropriate focus of inquiry ... should simply be upon the extent to which the claims asserted in the earlier class proceeding have in fact placed a defendant upon notice of the claims presently at issue"). *But see Wade v. Danek Med., Inc.*, 182 F.3d 281 (4th Cir.1999) (applying Virginia law in a

products liability case, and concluding that Virginia would not adopt cross-jurisdictional equitable tolling so as to toll limitations during the pendency of a class action filed in the federal court of another jurisdiction); *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923, 937 (1988) (concluding that *American Pipe* was not applicable under the facts of that case, because the class action complaint "never put defendants on notice that personal injury damages were being sought on a class basis"; stating "it would be unfair to defendants to toll the statute of limitations on such personal injury actions"; and recognizing that the court's ruling would not result in "duplicative litigation," which *American Pipe* sought to avoid).

We acknowledge that the many federal and state cases recognizing class action equitable tolling are informative but not controlling. Moreover, despite the decades-old application of *American Pipe* to class action litigation, we acknowledge that there is no Maryland legislation or appellate court decision that authorizes equitable tolling in the context of a class action. And, we are mindful that the Legislature and the Court of Appeals have surely known of the Supreme Court's construction of the federal class action rule, yet neither has acted to adopt the concept of class action tolling.

We are equally aware that Maryland courts "have long maintained a rule of strict construction concerning the tolling of the statute of limitations." *Hecht*, 333 Md. at 333, 635 A.2d 394. To that end, the Court of Appeals has "long adhered to the principle that where the legislature has not expressly provided for an exception in a statute of limitations, the court will not allow any implied or equitable exception to be engrafted upon it." *Booth Glass Co., Inc. v. Huntingfield Corp.*, 304 Md. 615, 623, 500 A.2d 641 (1985).

To illustrate, in *Walko Corp., supra*, 281 Md. 207, 378 A.2d 1100, the Court considered a certified question from a federal appeals court, which asked: "Was the statute of limitations prescribed by [C.J.] § 5–101 suspended during the pendency of appellant's motion for leave to intervene, ultimately denied,

in a civil action in [federal court]?" *Id.* at 208, 378 A.2d 1100. Concluding that limitations was not tolled, the Court explained:

This policy of repose has fostered a traditional rule concerning the tolling of statutes of limitations that can be fairly termed one of strict construction. Early on we adopted this rigorous stance: "The principle of law is indisputable, that when the Statute of Limitations once begins to run, nothing will stop or impede its operation." *Ruff v. Bull,* 16 Am.Dec. 290, 7 H. & J. 14, 16 (1825). The rule has lost little of its vitality.

\* \* \*

This venerable rule, which defers to the legislative intent expressed in the statute of limitations itself, and avoids implied exceptions or strained constructions, is also applicable in cases such as the one at bar where an action filed initially within the required period fails for some technical, procedural defect falling short of a full decision on the merits. Absent a statutory provision saving the plaintiff's rights,[] the remedy is barred where limitations has run during the pendency of the defective suit.

*Id.* at 210–12, 378 A.2d 1100 (some internal citations omitted).

In reaching its result, the Court indicated that there were no facts that warranted the relaxation of "the anti-tolling rule." *Id.* at 215, 378 A.2d 1100. Moreover, it observed that, following the denial of the motion to intervene, eleven days remained before limitations expired, and the appellant offered no explanation for the failure to file a timely action. *Id.*

In *McMahan v. Dorchester Fertilizer Co.,* 184 Md. 155, 40 A.2d 313 (1944), the Court held that payment of interest or principal on a debt does not toll limitations for a contract action. It said, *id.* at 159–60, 40 A.2d 313:

Statutes of limitations are remedial legislation and rest upon sound public policy, for they are enacted to afford protection against stale claims after a lapse of time which ought to be sufficient for a person of ordinary diligence, and after which

the defendant might be placed at a disadvantage by reason of long delay. By requiring persons to seek redress by actions at law within a reasonable time, the Legislature imposes a salutary vigilance and puts an end to litigation. Accordingly, the Courts should refuse to give statutes of limitations a strained construction to evade their effect. . . . "It would be going far for this court to add to those exceptions. * * * If this difficulty be produced by the legislative power, the same power might provide a remedy; but courts cannot, on that account, insert in the statute of limitations an exception which the statute does not contain." *McIver v. Ragan,* 2 Wheat. 25, 29, 30, 15 U.S. 25, 4 L.Ed. 175, 177. We conclude that, where the Legislature has not made an exception in express words in the Statute of Limitations, the Court cannot allow any implied and equitable exception to be engrafted upon the statute merely on the ground that such exception would be within the spirit or reason of the statute.

On the other hand, in *Bertonazzi v. Hillman, Adm'x,* 241 Md. 361, 216 A.2d 723 (1966), the Court relied on the concept of tolling to craft a narrow exception to the general rule against implied exceptions to the statute of limitations. The exception was limited to cases that were timely filed but later dismissed, based on improper venue, after limitations had expired. In its decision, the Court recognized that Maryland was one of only a few states that lacked either a savings statute or a venue transfer statute. Therefore, the Court concluded that "the commencement of the suit . . . tolled the statute [of limitations]." *Id.* at 371, 216 A.2d 723. *But see Walko Corp.,* 281 Md. at 214, 378 A.2d 1100 (*"Bertonazzi* stands alone . . . confined to the special circumstances which culminated in the filing of the suit in the wrong county").

The Court of Appeals has recognized, however, that the terms "accrual" and "tolling" have occasionally been used "interchangeably," albeit imprecisely, when "the application has been the same: to prevent limitations from running. . . ." *Hecht, supra,* 333 Md. at 339 n. 11, 635 A.2d 394. In *Hecht,* the Court adopted the doctrine of adverse domination with respect

to claims by a corporation against its directors for injuries sustained by the corporation at the hands of the directors. In doing so, the Court recognized the "practical" difficulties for a corporation to discover a claim when corporate agents are themselves the ones who are harming the corporation. *Id.* at 346, 635 A.2d 394. It said: "[W]here potential defendants are in control of the plaintiff corporation it is unrealistic to expect that those defendants will either facilitate discovery of a claim or assert a claim against themselves in favor of the corporation," because such actions are "clearly adverse to their own interests...." *Id.* at 345, 635 A.2d 394. Further, the Court explained that "knowledge of a claim by [culpable] defendant directors cannot reasonably be imputed to the Corporation." *Id.* To the contrary, said the Court, "[i]n an adverse domination situation the agent cannot reasonably be expected to act upon or communicate knowledge of his own wrongdoing to the corporation." *Id.* at 346, 635 A.2d 394.

In its discussion, the Court reviewed cases from other jurisdictions that had adopted the doctrine of adverse domination. Depending on the jurisdiction, the doctrine of adverse domination was "applied either to delay the accrual of a cause of action, or to toll limitations...." *Id.* at 339, 635 A.2d 394 (internal citations omitted). According to the Court, "the principles of adverse domination are more logically applied to determine accrual of a claim." *Id.* at 345, 635 A.2d 394. It reasoned: "The doctrine is premised upon the understanding that knowledge of a claim by defendant directors cannot reasonably be imputed to the corporation." *Id.* Yet, the Court also observed: "[W]here the legislature has not provided guidance, it has been left to the Court to define the process for determining accrual." *Id. See also Furst v. Isom,* 85 Md.App. 407, 420, 584 A.2d 108 (1991) (recognizing that the enactment of a savings statute is "a decision which rests solely with the legislature"; permitting plaintiffs to pursue action that had a technical defect, which was not timely corrected, because they relied "on the ruling of an authorized decision maker"; and carving out a "narrow exception" to avoid allowing statute of limitations "to be used as a shield under circumstances in

which it is clearly unjust and does not effectuate the purpose the statute is designed to vindicate").

To be sure, there are competing policy interests at stake here—"those inherent in the rules providing for class actions, *e.g.,* judicial economy and efficiency in litigation, and those inherent in statutes of limitation, *e.g.,* protecting defendants from unfair or stale claims." *Singer v. Eli Lilly & Co.,* 153 A.D.2d 210, 549 N.Y.S.2d 654, 658 (1990). Notwithstanding the reluctance of the Court of Appeals to expand limitations by way of tolling, we cannot ignore the rationale of the wealth of cases that have applied the doctrine of class action equitable tolling. In our view, a holding to the contrary would undermine a key goal in the enactment of the class action rule—a reduction in the multiplicity of needless lawsuits. In the absence of class action tolling, class members would have no alternative but to protect their interests by rushing to intervene in the class action as named plaintiffs, prior to a ruling on class certification, or by filing individual lawsuits. This would surely frustrate the purpose of the class action rule, in that it would generate "needless duplication" and overwhelm the courts with a corresponding loss of "efficiency and economy of litigation" that the class action rule was intended to achieve. *Am. Pipe,* 414 U.S. at 553–54, 94 S.Ct. 756.

Therefore, we conclude that, during the pendency of the class action lawsuit in *Richardson,* limitations was suspended for potential class members.[14] As Giant was not a defendant in the *Richardson* class action litigation, however, our ruling does not extend to Giant.

## II.

Because there is no equitable tolling as to Giant, we must also consider the court's ruling that the appellants' claims

---

14. It is also noteworthy that, long before limitations expired, appellees (except Giant) had considerable knowledge of the Decedent's claims. Indeed, Christensen was deposed over the course of three days in June of 1999 in connection with the *Richardson* class action case.

were barred by limitations. In its view, appellants' claims accrued at the time the Decedent learned that he had lung cancer, rather than when he learned his cancer was caused by cigarette smoking, and therefore suit was untimely filed.

Appellants argue, in part:

[A]n issue of material fact existed as to the reasonableness of Mr. Christensen's actions and his knowledge during this period of time. Whether Mr. Christensen believed that he had cancer is a foregone conclusion. Whether he should have reasonably surmised that it was caused by his smoking is an issue of material fact and one that can only be decided by the jury.

According to appellees, the trial court correctly determined that appellants' "claims accrued more than three years before they were filed." They rely on the doctrine of "inquiry notice" to support their contention that appellants' claims were untimely filed. In their view, the Decedent "was on inquiry notice that he may have had a claim against defendants no later than the Spring of 1998," when he learned that he had lung cancer. In support of this contention, appellees point out that, from at least the 1970's, Christensen knew generally that cigarette smoking causes lung cancer. Therefore, they insist that, even though the Decedent last smoked in 1976, he was on inquiry notice of the cause of his cancer well before the cause was clinically determined through the biopsy.

Moreover, appellees maintain that "Maryland courts have repeatedly held that an expert opinion on the cause of an injury is not necessary to put a claimant on inquiry notice so that the statute of limitations begins to run." They add:

The undisputed facts, drawn from the testimony of Mr. Christensen and appellants themselves, demonstrate that Mr. Christensen was well aware of the association between lung cancer and cigarette smoking long before 1998. Thus, when he knew in the Spring of 1998 that he had lung cancer, he had knowledge of all the circumstances that would cause a reasonable person to investigate whether he had a claim.

■ Under C.J. § 5–101, civil litigants generally have three years from the date their action accrues to file suit. *See Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 348, 822 A.2d 1212 (2003); *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 333, 635 A.2d 394 (1994). "Historically, the general rule in Maryland was that a cause of action accrued on the date the wrong was committed," regardless of whether the plaintiff knew or should have known of the wrong. *Id.* at 334, 635 A.2d 394. However, Maryland now applies the discovery rule to the concept of accrual.[15] *See Bank of N.Y. v. Sheff,* 382 Md. 235, 244, 854 A.2d 1269 (2004); *Pappano,* 374 Md. at 351, 822 A.2d 1212; *Hahn v. Claybrook,* 130 Md. 179, 186–87, 100 A. 83 (1917). That rule was adopted to address the "unfairness inherent in charging a plaintiff with slumbering on rights not reasonably possible to ascertain. . . ." *Hecht,* 333 Md. at 334, 635 A.2d 394.

Pursuant to the discovery rule, a "cause of action accrues when a plaintiff in fact knows or reasonably should know of the wrong." *Hecht,* 333 Md. at 334, 635 A.2d 394; *see O'Hara v. Kovens,* 305 Md. 280, 302, 503 A.2d 1313 (1986) (stating that, under the discovery rule, limitations commences when a reasonable person is "on notice," and has sufficient knowledge to prompt a reasonable person to "undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge" of the tort); *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981) (holding that a cause of action accrues when "the claimant knew or reasonably should have known of the wrong"). The effect of the discovery rule is that it "tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury." *Frederick Road Ltd. P'ship.,* 360 Md. at 95–96, 756 A.2d 963. "[C]onstructive knowledge, based on legal presumptions, will not suffice," however. *Ben-*

---

**15.** Maryland also recognizes other common law theories that "depart from the strict 'date of the wrong' rule of accrual," such as the "continuation of events" theory. *Hecht,* 333 Md. at 337, 635 A.2d 394. Because these other theories are not applicable here, we need not discuss them.

*jamin v. Union Carbide Corp.*, 162 Md.App. 173, 873 A.2d 463 (2005).

 Ordinarily, "[b]ecause the term 'accrues' is not defined in the statute, the question of when a cause of action accrues is left to judicial determination." *Pierce,* 296 Md. at 664, 464 A.2d 1020; *see Frederick Rd. Ltd. P'ship,* 360 Md. at 95, 756 A.2d 963; *United Parcel Serv., Inc. v. People's Counsel for Balt. County,* 336 Md. 569, 579, 650 A.2d 226 (1994); *Booth,* 304 Md. at 619, 500 A.2d 641. Depending upon the nature of the assertions with respect to the limitations plea, however, resolution of whether the action is barred may be one of law, one of fact, or one of law and fact. *Frederick Rd. Ltd. P'ship,* 360 Md. at 95, 756 A.2d 963; *see also CSX Transp., Inc. v. Miller,* 159 Md.App. 123, 150, 858 A.2d 1025 (2004)(examining the distinction between accrual as a matter of law and accrual as a matter of fact, and concluding that "the question was, indeed, one of fact for the jury to resolve."), *cert. granted,* 384 Md. 581, 865 A.2d 589 (2005). If "the viability of a statute of limitations defense hinges on a question of fact ..., the factual question is ordinarily resolved by a jury, rather than by a court." *Doe v. Archdiocese of Wash.,* 114 Md.App. 169, 178, 689 A.2d 634 (1997); *see Moreland v. Aetna U.S. Healthcare, Inc.,* 152 Md.App. 288, 296, 831 A.2d 1091 (2003). As the *Sheff* Court recently explained, 382 Md. at 244, 854 A.2d 1269:

> Like any other issue that is fact-dependent, if there is any genuine dispute of material fact as to when the plaintiffs possessed that degree of knowledge, the issue is one for the trier of fact to resolve; summary judgment is inappropriate. If there is no such genuine dispute, however, and the question of whether the plaintiffs were on inquiry notice more than three years before their suit was filed can be determined as a matter of law, summary judgment on that issue is, indeed, appropriate.[1]

(Internal citation omitted).

Addressing "the nature of the knowledge necessary, under the discovery rule, to start the running of the limitations

period," *Poffenberger,* 290 Md. at 636, 431 A.2d 677, the *Poffenberger* Court said:

> Notice is of two kinds—actual and constructive. Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other, by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand, always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact.... It is simply circumstantial evidence from which notice may be inferred. It differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, in respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, resting upon strictly legal presumptions which are not allowed to be controverted, whilst implied notice arises from inference of *fact.*
>
> As the knowledge imputed by the just defined constructive notice, if deemed to be sufficient to activate the running of limitations, would recreate the very inequity the discovery rule was designed to eradicate, we now hold this type of exposure does not constitute the requisite knowledge within the meaning of the rule. Affirmatively speaking, *we determine the discovery rule contemplates actual knowledge—that is express cognition, or awareness implied from*
>
>> *knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry* [thus, charging the individual] *with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.* In other words, a purchaser cannot fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to

him; and if he neglects to make such inquiry, he will be held guilty of bad faith and must suffer from his neglect.

*Id.* at 636–38, 431 A.2d 677 (Citations omitted; emphasis added).

Elucidating the concept of inquiry notice in *Pennwalt Corp.,* 314 Md. at 443, 550 A.2d 1155 a product liability case, the Court of Appeals explained:

[I]n simple terms, a plaintiff is only on inquiry notice, and thus the statute of limitations will begin to run, when the plaintiff has "knowledge of circumstances which would cause a reasonable person in the position of the plaintiff[ ] to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [tort]."

*Id.* at 448–49, 550 A.2d 1155 (Citation omitted).

Further, the *Pennwalt* Court commented, 314 Md. at 441, 550 A.2d 1155, that "an action accrues when the 'nature *and cause* of the injury,' and not merely when the nature of the injury, are known or should have been known." (Emphasis added). The Court added that the "application of the discovery rule in a product liability action requires that the statute of limitations should not begin to run until the plaintiff knows or through the exercise of due diligence should know of injury, *its probable cause,* and either manufacturer wrongdoing or product defect." *Id.* at 452, 550 A.2d 1155 (emphasis added); *see id.* at 453, 550 A.2d 1155 ("[L]imitations do not begin until a plaintiff knows or reasonably should know the nature and *cause* of his harm.") (emphasis added).

Numerous Maryland appellate cases are consistent with *Pennwalt,* and have recognized that a claim accrues when the plaintiff knows or should know of the harm and its probable cause. *See, e.g., Frederick Rd. Ltd. P'ship,* 360 Md. at 96, 756 A.2d 963 (stating, in a legal malpractice case, that "before an action is said to have accrued, a plaintiff must have notice of the *nature and cause* of his or her injury") (emphasis added); *United Parcel Service, Inc.,* 336 Md. at 579, 650 A.2d 226 (quoting *Hecht,* and recognizing that a claim accrues when the

plaintiff " 'knows or should know of the injury, its probable cause, and ... [the defendant's] wrongdoing. ...' "); *Owens–Illinois v. Armstrong*, 326 Md. 107, 120–21, 604 A.2d 47 (1992) (recognizing that a cause of action accrues when a reasonably diligent plaintiff ascertains the nature and cause of his injury); *Trimper v. Porter–Hayden*, 305 Md. 31, 52, 501 A.2d 446 (1985) (recognizing, in a latent disease case, that an injured person's cause of action accrues "either 1) when he ascertains, or through the exercise of reasonable care and diligence should have ascertained, the nature *and cause* of his injury, or 2) at death, whichever first occurs") (emphasis added); *Harig v. Johns–Manville Products Corp.*, 284 Md. 70, 83, 394 A.2d 299 (1978) (concluding that, "in situations involving the latent development of disease, a plaintiff's cause of action accrues when he ascertains, or through the exercise of reasonable care and diligence, should have ascertained, the nature *and cause* of his injury") (emphasis added); *Benjamin*, 162 Md.App. at 197, 873 A.2d 463 (suggesting that *Trimper* "indicates that the knowledge that a reasonable investigation would disclose is probably not sufficient if it would only show injury"); *Young v. Medlantic Laboratory P'ship*, 125 Md.App. 299, 305–06, 312, 725 A.2d 572 (recognizing that, "[u]nder the discovery rule, a cause of action accrues (thereby triggering the limitations period) when the patient discovers, or should have discovered, that he or she has a cause of action") and concluding "that the trial court erred in deciding, as a matter of law, that appellant's claim was barred by the statute of limitations," because "reasonable minds could differ over whether appellant should have further investigated into the matter sooner or more completely; whether she failed to exercise the degree of diligence that a reasonable person in her circumstance would have exercised; or whether any reasonable exercise of diligence under the circumstances would have led to an earlier discovery of appellee's breach of duty"), *cert. denied*, 354 Md. 572, 731 A.2d 970 (1999); *see also United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (concluding, under the Federal Tort Claims Act, that the plaintiff's negli-

gence claim accrued when plaintiff knew of both the existence of the harm its cause).

Subsequent to the appellate argument in the case *sub judice*, this Court decided *Benjamin v. Union Carbide, supra,* a product liability asbestos case. We pause to review it.

In *Benjamin,* the decedent was diagnosed with mesothelioma in early 1997, from which he died on May 25, 1997. Although the disease was indisputably caused by exposure to asbestos, the decedent's wife and children waited until March of 2003 to bring survival and wrongful death actions, claiming, *inter alia,* that they did not know until late 2001 that "the disease was caused by exposure to asbestos...." *Id.,* 162 Md.App. at 179, 873 A.2d 463.

The defendants moved for summary judgment based on limitations, arguing, among other things, that the "actual express knowledge possessed by the decedent and [the widow], i.e., the diagnosis of mesothelioma, was sufficient to put them on inquiry notice, no later than the spring of 1997, that the decedent's exposure to asbestos was the cause of his mesothelioma." *Id.* In response, the widow claimed that neither she nor her husband was informed of the causal connection between asbestos exposure and the disease, nor did they inquire at the time of the diagnosis. *Id.,* 162 Md.App. at 181, 873 A.2d 463. The wife's "sole argument [was] that neither she, the other beneficiaries, nor the decedent had sufficient actual knowledge to place them on inquiry notice so as to charge them with the knowledge that a reasonable investigation would have revealed." *Id.,* 162 Md.App. at 186, 873 A.2d 463. Had they merely inquired, however, they would have learned of the causal connection between the decedent's illness and his exposure to asbestos.

With respect to the survival claim, this Court upheld the award of summary judgment to the defendants, based on limitations. We observed that "[t]he discovery rule, including the inquiry notice prong, has to be considered and applied in the context of the facts of a particular case." *Id.,* 162 Md.App. at 204, 873 A.2d 463. The Court concluded that the decedent's "express knowledge of mesothelioma and asbestos exposure

was sufficient to put the decedent on inquiry notice in his lifetime." *Id.* at 180, 873 A.2d 463; *see also* 162 Md.App. at 204, 873 A.2d 463. We explained: "We reach this decision because, based on the state of general knowledge of occupational diseases and asbestos exposure in 1997, a reasonable person with the decedent's actual knowledge would have conducted an inquiry." *Id.,* 162 Md.App. at 204, 873 A.2d 463. In our view, "[a]ll of the facts necessary to make a claim were in existence at the time of the diagnosis of mesothelioma, and a reasonable inquiry would have disclosed a cause of action." *Id.* at 204, 873 A.2d 463.

Nevertheless, we reversed the award of summary judgment as to the wrongful death claims of the wife and children, holding that "express knowledge of the diagnosis of mesothelioma alone was insufficient to satisfy, as a matter of law, the inquiry notice requirement." *Id.,* 162 Md.App. at 180, 873 A.2d 463; *see also id.* at 204, 873 A.2d 463. We reasoned that "there [was] no evidence that the express knowledge of the [wife] or that of the surviving children was more than the diagnosis of mesothelioma. . . ." *Id.* In reaching our result, we also said: "Significantly, not only is there no evidence that [the wife] had express knowledge of a causal connection between mesothelioma and asbestos, there is no evidence that [she] had express knowledge that the decedent had been exposed to asbestos. . . ." *Id.,* 162 Md.App. at 185, 873 A.2d 463.

Writing for the Court, Judge James Eyler explained:

> *Although appellant and the other beneficiaries had express knowledge, no later than 1997, that the decedent's death was due to mesothelioma, we hold that that knowledge alone is insufficient, as a matter of law, to constitute inquiry notice.* There is no evidence that appellant or the other beneficiaries had express knowledge of the decedent's asbestos exposure prior to late 2001. We reach this conclusion because, in our view, the knowledge must be such as to prompt a reasonable person to inquire as to a possible connection between the injury and causative factors. *While knowledge of injury or disease alone may be sufficient, as a*

*matter of law, to satisfy inquiry notice, ordinarily it is not sufficient.*

The direct evidence of express knowledge in the case before us is that appellant and the other beneficiaries knew only that the cause of death was mesothelioma, prior to late 2001. As stated above, in a motion for summary judgment, *the non-moving party, here appellant, gets the benefit of all reasonable inferences.* Consequently, we are unwilling to infer, as a matter of law, that appellant [i.e., the widow] knew the decedent was exposed to asbestos based on her relationship with the decedent and having accompanied the decedent to health care providers. *Similarly, we are unwilling to infer that appellant had any knowledge as to the nature of mesothelioma other than that it was a form of cancer. Whether such an inference(s) should be drawn, i.e., whether appellant impliedly had such knowledge, or other knowledge, is a question for the fact finder. If the fact finder were* to conclude that appellant had such knowledge sometime prior to 2001, either by drawing a reasonable inference from the testimony as we know it, or by resolving a credibility determination against appellant as to what she knew when, the cause of action accrued as of that time. Thus, *because knowledge of mesothelioma alone is insufficient for inquiry notice, and on the record before us, it is a fact question as to when appellant had greater knowledge, summary disposition of the wrongful death claim was inappropriate.*

*Id.,* 162 Md.App. at 205–06, 873 A.2d 463 (Emphasis added).

Because the circuit court did not have the benefit of our opinion in *Benjamin,* we shall neither affirm nor reverse the lower court's disposition of the survival and wrongful death claims based on limitations. *See* Md. Rule 8–604(d). Instead, as to Giant, we shall vacate the summary judgment and remand the case for further proceedings, to enable the court to reconsider its limitations ruling in light of our decision in *Benjamin.*[16]

---

**16.** We observe that in *Benjamin,* 162 Md.App. at 190, 873 A.2d 463, we concluded "that, in order for a limitations defense to a survival claim to

On remand, any analysis of the limitations issue must take into account the posture of the case. Maryland Rule 2–501 establishes a two-part test for summary judgment: the trial court must decide whether there is any genuine dispute as to material facts and, if not, whether either party is entitled to judgment as a matter of law. *Johnson v. Mayor and City Council of Baltimore City*, 387 Md. 1, 5, 874 A.2d 439 (2005); *Walk v. Hartford Cas. Ins. Co.*, 382 Md. 1, 14, 852 A.2d 98 (2004); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993). A material fact is one that will affect the outcome of the case, depending upon how the factfinder resolves the dispute. *Arroyo v. Bd. of Educ. of Howard County*, 381 Md. 646, 654, 851 A.2d 576 (2004); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Mandl v. Bailey*, 159 Md.App. 64, 82, 858 A.2d 508 (2004). Moreover, the movant has the burden with respect to a summary judgment motion. *See Nerenberg v. RICA of Southern Md.*, 131 Md.App. 646, 660, 750 A.2d 655, *cert. denied*, 360 Md. 275, 757 A.2d 810 (2000).

Notably, the Court of Appeals has cautioned: "The hearing on a motion for summary judgment is not to determine disputed facts but to determine whether there are disputed facts." *Jones v. Mid–Atl. Funding Co.*, 362 Md. 661, 675–76, 766 A.2d 617 (2001). Moreover, all factual disputes, and reasonable inferences drawn from the facts, are resolved in favor of the non-moving party. *Jurgensen v. New Phoenix*, 380 Md. 106, 114, 843 A.2d 865 (2004); *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 94, 756 A.2d 963 (2000).

---

bar a cause of action for wrongful death, the applicable limitations period must expire before the decedent's death." If Christiansen learned he had lung cancer in the Spring of 1998, as appellees contend, he would have had until the Spring of 2001 to file suit. Therefore, it would seem that, even under appellees' analysis, limitations did not expire prior to Christiansen's death in January of 2001.

Moreover, application of the discovery rule requires a determination of the knowledge possessed by the Decedent for purposes of the survival action. It also requires a separate determination of the knowledge possessed by the beneficiaries with respect to the wrongful death action.

In resolving the motion, the trial court may not determine the credibility of witnesses. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 326, 389 A.2d 887 (1978); *Thacker v. City of Hyattsville,* 135 Md.App. 268, 286, 762 A.2d 172 (2000), *cert. denied,* 363 Md. 206, 768 A.2d 55 (2001).

■ In this regard, we note that the circuit court placed considerable emphasis on the fact that the Decedent was long aware of the general association between cigarette smoking and cancer. Further, the circuit court adopted in its Opinion, as "undisputed facts," some of the factual chronology set forth in appellees' summary judgment motion. To illustrate, appellees asserted in their memorandum, in part:

> *May 6, 1998.* Because the x-ray was abnormal, Dr. Shorofsky ordered a CAT scan of Mr. Christensen's lungs. The CAT scan definitively showed both a pleural mass and a paratracheal adenopathy. SOF ¶ 24.[17] Mr. Christensen discussed the test results with his doctor, who was "very worried" that Mr. Christensen had cancer. SOF ¶ 25. Based on his discussion with his doctor, *Mr. Christensen told his wife that he had cancer, which he believed was caused by smoking.* SOF ¶ 26. This occurred more than three years before the Plaintiffs filed suit.

(Emphasis added). That same passage appears as an undisputed finding of fact in the court's Opinion. Thus, the court found that the Decedent believed, as of May 6, 1998, that his cancer was caused by smoking.

Appellees cited to a portion of Ms. Christensen's deposition testimony to support their claim. In that excerpt, appellees claimed that Ms. Christensen said her husband learned of the CAT scan results on May 6, 1998, *and* that he told her *at that time* that his cancer was caused by smoking. However, the deposition excerpt provided to us states only that Ms. Christensen said she was told by her husband that he had cancer.

17. "SOF" is a shorthand reference to appellees' "Statement of Facts."

She did not testify that he also told her at that time that he believed the cancer was caused by cigarette smoking.[18]

Moreover, appellants vigorously disputed appellees' averment as to knowledge of causation, arguing that the Decedent's own testimony conflicted with appellees' contention. They pointed to the Decedent's deposition testimony, in which he stated that he quit smoking some twenty-two years before he was diagnosed with lung cancer, and that he never had even a single cigarette after 1976. Appellants also observed that the Decedent had expressly testified that, given the number of years that had elapsed since he last smoked, he did not realize when he first learned of his illness that it might have been caused by smoking. Specifically, Christensen testified at his deposition:

> And certainly I had no idea that this cancer could lie in wait until a year ago. I thought I had done the things that would stop the, quote, unquote, lung problem.
>
> And by the way, they [i.e., the Project] never told me what the lung problem was.

(Emphasis added).

As we see it, the motion court was clearly erroneous in finding as an undisputed fact that the Decedent believed as early as May 6, 1998, that his lung cancer was caused by his cigarette smoking. As the case was heard on summary judgment, the court was not supposed to resolve disputed facts. Moreover, the court was required to construe the facts and inferences in the light most favorable to appellants. The significance of the factual error, however, is a matter for the circuit court and the parties to consider on remand, in light of all undisputed facts and the legal principles set forth in this opinion.

**SUMMARY JUDGMENT VACATED AS TO GIANT FOOD L.L.C.; SUMMARY JUDGMENT IN FAVOR OF**

---

18. Indeed, we have not found any testimony in the record that supports the finding that Christensen told his wife at the time of his CAT scan in May 1998 that he knew or believed his cancer was caused by smoking.

**672**

ALL OTHER APPELLEES REVERSED. CASE RE-MANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.